Lee GIBSON and Corrine
Gibson, Appellants,

v.

ITT HARTFORD INSURANCE
COMPANY, Appellee.

No. 99–0386.

Supreme Court of Iowa.

Jan. 18, 2001.

W. Curtis Hewitt of W. Curtis Hewitt, P.C., Council Bluffs, for appellants.

Philip Willson of Willson & Pechacek, P.L.C., Council Bluffs, for appellee.

LAVORATO, Chief Justice.

Lee Gibson filed this action against ITT Hartford Insurance Company (ITT) alleging multiple theories of recovery and punitive damages arising out of ITT's handling of Gibson's claim for workers' compensation benefits. Before submitting the case to the jury, the district court granted ITT's motion for directed verdict on several of the liability theories and on punitive damages. The court then submitted the balance of the liability theories to the jury, which returned a verdict on each of them. Later, the court granted ITT's motion for judgment notwithstanding the verdict on all but two of the theories.

Gibson appealed, challenging the ruling on the motion for directed verdict only as to punitive damages and challenging the district court's ruling sustaining the motion for judgment notwithstanding the verdict. ITT has not appealed. We reverse the directed verdict ruling on punitive damages and affirm the ruling on ITT's

motion for judgment notwithstanding the verdict.

## I. Scope of Review.

Our review of rulings granting motions for directed verdict is for correction of errors at law. Iowa R.App. P. 4; *Balmer v. Hawkeye Steel,* 604 N.W.2d 639, 640 (Iowa 2000). In our review, "we view the evidence in the same light as the district court to determine whether the evidence generated a jury question." *Id.* at 640–41. We therefore view the evidence in the light most favorable to the party opposing the motion, who in this case is Gibson. *See* Iowa R.App. P. 14(f)(2); *Econ. Roofing & Insulating v. Zumaris,* 538 N.W.2d 641, 649 (Iowa 1995). If reasonable minds could differ on an issue of fact, the issue is for the jury. *Id.*

In ruling on such motions, the district court must decide whether the nonmoving party has presented substantial evidence on each element of the claim. *Balmer,* 604 N.W.2d at 641. "Evidence is substantial if a jury could reasonably infer a fact from the evidence." *Id.* A directed verdict is appropriate if the evidence is not substantial. *Id.*

We likewise review a district court ruling on a motion for judgment notwithstanding the verdict for correction of errors at law. Iowa R.App. P. 4; *Midwest Home Distrib., Inc. v. Domco Indus. Ltd.,* 585 N.W.2d 735, 738 (Iowa 1998). We inquire whether substantial evidence exists to support each element of the plaintiff's claim, justifying submission of the case to the jury. *See Midwest,* 585 N.W.2d at 738. In making this determination, we view the evidence in the light most favorable to the nonmoving party. Iowa R.App. P. 14(f)(2); *Midwest,* 585 N.W.2d at 738.

## II. Facts.

Viewing the evidence in the light most favorable to Gibson, we think the evidence supports the following facts. In November 1990, Gibson, while employed by a Nebraska employer, sustained a work-related injury to his lower back. Dr. Patrick Bowman, after performing five surgeries on Gibson, rated him as having a twenty-two percent permanent partial impairment.

In May 1992, Gibson began working for The Garden Café as a line cook and later as a prep-cook. In March 1993, he sustained a temporary aggravation to his preexisting low back condition when his vehicle was struck from the rear by another vehicle. Dr. Bowman diagnosed and treated Gibson for "posttraumatic cervical and lumbar strain with a history of interbody fusion" of vertebrae.

Following the accident, Gibson missed several weeks of work. Dr. Bowman allowed him to return to light-duty work at The Garden Café. On May 6, 1993, Dr. Bowman released Gibson to return to full-duty work at The Garden Café. The following day, Gibson slipped and fell while removing food from one of the restaurant coolers. He was hospitalized for a week. At the hospital, Dr. John Marshall treated Gibson's injury, which he diagnosed as "back pain related to musculoskeletal strain of the lumbosacral region aggravated by trauma."

Gibson filed a claim for workers' compensation benefits. ITT was the workers' compensation carrier for The Garden Café. ITT assigned Gibson's claim to Darlene Haverstock, a claims representative for ITT. Haverstock investigated the incident and determined Gibson had in fact suffered an injury arising out of and in the course of his employment on May 7, 1993. On May 18, ITT began making weekly benefit payments to Gibson and began paying Gibson's medical expenses, including those related to his hospitalization. ITT did not file with the Iowa Industrial Commissioner a Commissioner's Form 2 denying liability on Gibson's claim. *See* Iowa Admin. Code r. 876—3.1(2) (1998). Nor did ITT advise Gibson that it denied he had suffered a work-related injury.

After his release from the hospital, Gibson returned to Dr. Bowman's care. Dr. Bowman diagnosed Gibson's condition as "an aggravation of a preexisting condition." The doctor prescribed medication and directed Gibson to begin physical therapy and restricted him from working.

Sometime in May, Haverstock obtained a neurological consultation report from Dr. Behrouz Rassekh concerning Gibson's May 7 injury. At the time of the consultation, Gibson was complaining of severe back pain, had difficulty standing in an upright position, and could not extend his spine because of "the recent fall."

On July 12, Haverstock submitted her "Initial Report" to ITT and reported her conclusion that Gibson's injury was compensable as an aggravation of his preexisting lumbar spine condition.

In the same month, Dr. Bowman prescribed a myelogram, a diagnostic procedure. Following ITT's refusal to pay for the procedure, Gibson filed an application for alternate care in September. *See* Iowa Code § 85.27 (1993) ("If the employer and employee cannot agree on such alternate care, the commissioner may, upon application and reasonable proofs of the necessity therefor, allow and order other care."); *see also* Iowa Admin. Code r. 876—4.48 (1998). At the hearing on the application, Haverstock told the presiding deputy commissioner that Gibson had suffered a compensable injury arising out of and in the course of his employment on May 7, 1993, and that ITT was liable on his claim for compensation benefits. Following a hearing, the Iowa Industrial Commissioner issued an alternate care decision on October 6.

The deputy commissioner who handled the application concluded that Dr. Bowman was an authorized treating physician in this matter and that ITT had acquiesced in Gibson's care since the May 7 injury. The deputy commissioner further concluded that (1) Dr. Bowman had recommended the myelogram to assess Gibson's condition and to determine a future course of treatment; (2) Gibson was entitled to reasonable care, which included care necessary to diagnose the condition; (3) Gibson had not yet received all of the care that Dr. Bowman had recommended; (4) ITT was not entitled to interpose its judgment in contravention of Dr. Bowman's recommendation; and (5) ITT's failure to follow the recommendations constituted a failure to provide reasonable treatment. *See* Iowa Code § 85.27 (providing that "the employer is obliged to furnish reasonable services and supplies to treat an injured employee" and that "treatment must be offered promptly and be reasonably suited to treat the injury"). The deputy commissioner ordered ITT to provide Gibson with a diagnostic myelogram and follow-up care as Dr. Bowman had recommended.

Dr. Bowman apparently concluded that a myelogram was not needed. Instead, he did an MRI, which showed no encroachment into the neural canal at any level and a solid fusion from the surgeries performed in connection with the prior 1990 Nebraska accident. ITT paid for the MRI procedure.

In November, Dr. Bowman referred Gibson to Dr. John Stark, a psychologist, for an evaluation and short-term psychotherapy. In a report to Dr. Bowman, Dr. Stark stated that Gibson was depressed and that he needed a "few sessions to help him deal with his chronic pain syndrome." ITT received a copy of this report in February 1994.

In February 1994, ITT hired Lee McMullen, a nurse who is a rehabilitation and vocational specialist, to work on Gibson's claim. Later that month, McMullen met with employees of The Garden Café. Together they crafted a "job analysis" of a light-duty job the employees told McMullen was then available to Gibson.

On March 14, McMullen met with Gibson and Dr. Bowman to discuss the light-duty job at The Garden Café. Dr. Bowman told McMullen he wanted a functional capacities evaluation conducted before he

would release Gibson for work. About a month later, Dr. Bowman wrote McMullen that he had reviewed the results of the functional capacity assessment, which indicated that Gibson's medical condition was "generally compatible with the job" that The Garden Café had offered him.

On May 18, McMullen wrote Dr. Bowman requesting a rating of Gibson's disability from his May 7, 1993 work injury. A week later, Dr. Bowman informed McMullen that Gibson was at maximum medical improvement and had a twenty-eight percent impairment of the body as a whole. However, the doctor assigned only two percent of that total impairment to the May 7 injury. On that day, Dr. Bowman released Gibson to return to work.

At some point before May 18, McMullen had learned that The Garden Café was not going to allow Gibson to return to work. McMullen did not inform Dr. Bowman of this development when she requested the disability rating. Gibson was unable to find another job until February 1996.

As early as the middle of July 1994, ITT knew that Gibson's impairment rating from his 1990 injury was twenty-two percent and his total impairment after the May 7, 1993 injury was twenty-eight percent. Therefore, his impairment from the May 7, 1993 injury was six percent, rather than two percent, as Dr. Bowman had erroneously reported. Nevertheless, ITT terminated Gibson's benefits on August 18, 1994, as it had previously said it would do in a June 22, 1994 letter to him.

When it terminated Gibson's benefits on August 18, ITT had paid Gibson ten weeks of benefits for permanent partial disability. ITT paid the ten weeks based on the erroneous two percent disability rating from Dr. Bowman, knowing full well that it really owed Gibson twenty additional weeks of benefits based on his true impairment of six percent. ITT was aware that a workers' compensation insurance carrier was legally required to pay the functional impairment rating in a case of admitted compensability.

On August 1, 1994, Dr. Bowman referred Gibson to Dr. Bruce Gutnik, a psychiatrist. Dr. Gutnik treated Gibson on fourteen separate occasions, starting on August 23. Dr. Gutnik opined that Gibson was suffering from major depression. He found that "Gibson's present psychiatric conditions [were] a direct result [of] and causally connected to his injury on the job, which occurred in May 1993." Gutnik further opined that Gibson's depression, "along with his anxiety, [was] a direct result of Mr. Gibson's pain, inability to work, attendant financial worries, and inability to do things that he used to do."

On August 16, Gibson filed an original notice and petition with the Iowa Industrial Commissioner, seeking additional weekly benefits and medical care regarding the May 7, 1993 injury. The following day, Haverstock sent a copy of the petition to ITT's attorney, Joseph Andres, requesting that he answer the petition. Haverstock sent along with these documents ITT's entire claims file as it existed on that date, including her "Activity Log," Dr. Stark's November 23, 1993 report, and the October 6, 1993 alternate medical care decision. Andres filed an answer to the petition, denying that a work-related injury had occurred on May 7, 1993.

When Haverstock sent Gibson's petition to Andres, she still believed Gibson had suffered a work-related injury on May 7, 1993. Andres filed the answer denying that Gibson's injury was work related without discussing with Haverstock whether he should or should not admit or deny the injury was work related. Haverstock did not learn until November 15, 1994, that Andres had denied the occurrence of a compensable injury that she had always admitted. Yet she never asked Andres to withdraw the answer denying Gibson's injury was compensable, *i.e.*, work related.

On September 2, 1994, Gibson's attorney, Curtis Hewett, wrote to Andres. Hewett told Andres that Dr. Bowman had referred Gibson to Dr. Gutnik. Hewett

also asked that Gibson's benefits be reinstated and that arrearages "from when benefits terminated be brought current." ITT refused to pay for Dr. Gutnik's psychiatric treatment of Gibson and did not reinstate Gibson's benefits.

On November 15, Gibson filed an application for alternate medical care with the Iowa Industrial Commissioner to compel coverage of Dr. Gutnik's treatment. *See* Iowa Code § 85.27; Iowa Admin. Code r. 876—4.48. A deputy industrial commissioner dismissed the application on November 29 because ITT had answered the application by denying liability for Gibson's injury. *See* Iowa Admin. Code r. 876—4.48(7) ("If an application [for alternate medical care] is filed where the liability of the employer is an issue, the application will be dismissed without prejudice."). The deputy's order explained the dismissal by noting that, "[b]efore any benefits can be ordered, including medical benefits, compensability of the claim must be established, either by admission of liability or by adjudication." ITT knew that when it denied liability for Gibson's injury, the denial would prevent Gibson from having a hearing on his November 15 alternate medical care application.

On December 1, Hewett notified Andres that Dr. Bowman had made a mathematical error in assigning a two percent impairment of the body as a whole to the May 7, 1993 injury. Hewett pointed out that in 1992 Dr. Bowman stated in a report that Gibson had sustained a twenty-two percent impairment as result of the 1990 injury and that Dr. Bowman was now opining that Gibson had a twenty-eight percent impairment. This meant that instead of a two percent impairment, Gibson had actually suffered a six percent impairment resulting from the May 7, 1993 injury. Hewett demanded an additional twenty weeks of benefits called for by the difference of a six percent and two percent rating.

ITT refused to pay the additional twenty weeks in light of its previous answer to Gibson's petition for additional benefits in which ITT denied liability for Gibson's May 7, 1993 injury. ITT knew that, but for this denial of liability it had previously admitted, it was legally required to pay Gibson the additional twenty weeks of benefits.

### III. Present Proceedings.

On January 12, 1995, Gibson filed suit against ITT. He alleged bad faith, abuse of process, intentional interference with a contract, misrepresentation, breach of fiduciary duty, and intentional infliction of severe emotional distress. In addition to compensatory damages, Gibson sought punitive damages as to each claim. Gibson's wife, Corrine Gibson, joined the suit, seeking spousal consortium.

On October 15, 1997, the district court ruled on Gibson's application for adjudication of law points. Gibson filed the application, seeking issue preclusion in his bad-faith claim based on a February 22, 1997 ruling by a deputy industrial commissioner on Gibson's August 16, 1994 petition filed with the industrial commissioner. The deputy found that Gibson had sustained a work-related injury that had caused an aggravation of his low back condition and a psychiatric condition of major depressive disorder. The deputy ordered ITT to pay Gibson 212.5 weeks of permanent partial disability benefits and fifty-five weeks of healing-period benefits.

The deputy also found that ITT had "no reasonable excuse for [its] failure to pay [Gibson]" the additional twenty weeks of requested benefits earlier mentioned. The deputy ordered ITT to pay Gibson a penalty equal to ten weeks worth of benefits. *See* Iowa Code § 86.13 (providing that "[i]f a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse, the industrial commissioner shall award" additional benefits "up to fifty percent of the amount of benefits that were unreasonably delayed or denied").

In ruling on Gibson's application for adjudication of law points, the district court first noted that Gibson had alleged a first-party bad-faith claim, and that in the context of this case, there were two elements to the claim that had to be satisfied. Those elements included (1) an absence of a reasonable basis for denying benefits under ITT's workers' compensation policy, and (2) proof of ITT's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.

The court additionally noted that the first element mirrors the requirement for imposition of penalties under Iowa Code section 86.13. For this reason, the court concluded that it should give the deputy's findings preclusive effect as to the first element of Gibson's first-party bad-faith claim.

The parties tried the case to a jury. At the close of Gibson's case, the district court granted ITT's motion for directed verdict as to Gibson's claims for punitive damages.

Following the close of all the evidence, the district court sustained ITT's motion for directed verdict as to the claims of intentional infliction of emotional distress and breach of fiduciary duty. The court denied ITT's motion as to the remaining claims.

The district court submitted to the jury Gibson's claims of bad faith, abuse of process, intentional · interference with a contract, negligent misrepresentation, fraudulent misrepresentation, fraudulent concealment, and his wife's claim for loss of spousal consortium.

The jury returned a verdict in favor of Gibson on all the claims submitted. After eliminating duplicative damages, the district court entered judgment for Gibson in the amount of $17,183 plus interest and costs and judgment for his wife in the amount of $7000.

Later, the district court granted ITT's motion for judgment notwithstanding the verdict on all of the claims submitted to the jury except two: bad faith and abuse of process. Gibson appealed; ITT did not.

## IV. Issues.

Gibson presents three main issues on appeal. First, he contends the district court erred in granting ITT's motion for directed verdict as to his claims for punitive damages regarding his bad-faith and abuse-of-process claims. Second, he contends the district court erred in granting ITT's motion for judgment notwithstanding the verdict on his claim of intentional interference with a contract. Last, he contends the district court erred in granting ITT's motion for judgment notwithstanding the verdict on his claim of fraudulent misrepresentation.

## V. Motion for Directed Verdict Ruling.

Gibson first contends that the district court erred in directing a verdict in favor of ITT on his claims for punitive damages.

**A. Legal background.** Iowa Code section 668A.1 sets the standard for awarding punitive damages:

> Whether, by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another.

Iowa Code § 668A.1(a).

We have defined "willful and wanton" in the context of this statute to mean that

> "the actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences."

*McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000) (quoting *Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911, 919 (Iowa 1990)).

■■ To establish the requirement of "willful and wanton disregard for the rights or safety of another," a plaintiff must show that the defendant's conduct constituted actual or legal malice. *Id.* at 231. "Actual malice is characterized by such factors as personal spite, hatred, or ill will." *Id.* "Legal malice is shown by wrongful conduct committed or continued with a willful or reckless disregard for another's rights." *Id.* Necessarily, then, a claim for punitive damages must be supported by something more than merely negligent conduct. *Id.* at 230.

**B. Procedural background.** In sustaining ITT's motion for directed verdict, the district court recognized that, based on issue preclusion, there was no dispute ITT had committed an intentional act in its failure to pay the additional twenty weeks that Gibson had requested. However, the court went on to explain:

> If we go as [plaintiff] suggests simply on the unreasonable basis, unreasonable character of the act, then I think we still have to find its highly probable that harm will follow. The harm of failure to pay 20 weeks is not the kind of harm the court believes is contemplated by the [Iowa Supreme] Court in talking about punitive damages. [Whether] [h]arm will follow by not paying psychiatrist's bill[s] or furnishing psychiatric services is maybe a little more close question. . . .
>
> As we've indicated earlier, the acts of the defendant in this case just simply apparently two acts—maybe three. We're talking about the myelogram, the failure to provide, furnish psychiatric care, to pay for Dr. Gutnik's services, and the failure to pay the 20 weeks. Those acts are clearly intentional, and the consequences of those acts are certainly known to a certain degree. . . .
>
> But my—the Court's problem here is that under 668A, there must be a showing of willful and wanton disregard for the rights of the plaintiff. . . . There isn't actual malice here. . . . I think what we're dealing with is legal malice. . . .

> The Court recognizes . . . issue preclusion indicates . . . [t]he actions were unreasonable. . . . [B]ut the court simply does not find there is sufficient evidence for a rational trier of fact to find by clear, convincing and satisfactory evidence that the conduct committed by the defendant was done with willful, wanton or reckless disregard for the rights or safety of the plaintiff or there was a high probability that harm would follow the acts that were taken.

**C. Analysis.** Gibson disagrees with the district court's reasoning. He argues that the evidence in this case that supports the judgment against ITT for bad faith and abuse of process is enough to justify submission of the punitive-damages claim to the jury. The issue, then, narrows to whether the evidence in this case that warranted submission of the bad-faith and abuse-of-process claims also warrants submission of the punitive-damages claim.

■■■■ **1. Bad faith.** To establish a first-party bad-faith claim, " 'a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.' " *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988) (quoting *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 690, 271 N.W.2d 368, 376 (1978)). A reasonable basis exists for denying insurance benefits if the claim is "fairly debatable" as to either matters of fact or law. *Id.*

In *Boylan v. American Motorists Insurance Co.*, we extended this common-law tort theory to workers' compensation. *See* 489 N.W.2d 742, 744 (Iowa 1992). We concluded that the relationship between an injured employee and the employer's workers' compensation carrier is analogous to those first-party insurance claims for which this court in *Dolan* recognized tort liability for bad faith. *See id.* at 743.

We also rejected a district court holding that Iowa Code section 86.13 provided a

statutory remedy for unreasonably delayed or withheld workers' compensation benefits thereby providing an exclusive remedy and precluding a common-law bad-faith claim. *See id.* at 742; *see also* Iowa Code § 86.13 (providing that the industrial commissioner may award penalty benefits "[i]f a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse"). In doing so, we said that "it is unlikely that the legislature intended the penalty provision in section 86.13 to be the sole remedy for all types of wrongful conduct by carriers with respect to the administration of workers' compensation benefits." *Id.* at 744.

Finally, we held that section 86.13 recognizes an affirmative duty "on the part of the employer and insurance carrier to act reasonably in the absence of specific direction by the commissioner." *Id.* at 743.

Borrowing from our bad-faith decisions, we held in *Covia v. Robinson* that, in the workers' compensation context, a reasonable excuse exists if the claim for benefits is "fairly debatable." 507 N.W.2d 411, 416 (Iowa 1993). In *Christensen v. Snap On–Tools Corp.,* we said that for purposes of Iowa Code section 86.13,

> [a] reasonable cause or excuse exists if either (1) the delay was necessary for the insurer to investigate the claim or (2) the employer had a reasonable basis to contest the employee's entitlement to benefits. A "reasonable basis" for denial of the claim exists if the claim is "fairly debatable."

554 N.W.2d 254, 260 (Iowa 1996).

In sum, when a workers' compensation carrier has no reasonable cause or excuse for "a delay in commencement or termination of benefits," such a failure establishes the first prong of a bad-faith claim. However, the "[u]se of the bad faith 'fairly debatable' standard does not require that we also use the second element of the bad-faith claim: the insurer's 'knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.' " *Id.* (quoting *Dolan,* 431 N.W.2d at 794). In short, "[s]ection 86.13 does not require that the lack of a reasonable excuse be due to any particular type of conduct by the insurer, whether negligent, reckless or intentional." *Id.*

As to Gibson's bad-faith claim, the district court instructed the jury that Gibson had to prove the following:

1. [ITT] denied [Gibson's] claim: (a) for a specific twenty weeks of workers' compensation benefits; or (b) for psychiatric treatment furnished by [ITT].

2. There was no reasonable basis for denying [Gibson's] claim.

3. [ITT] knew or had reason to know that there was no reasonable basis for denying the claim.

4. The denial was a proximate cause of damage to [Gibson].

5. The nature and extent of damage.

The district court further instructed the jury that a previous determination had already been made that ITT had no reasonable basis for its refusal to pay the twenty weeks of workers' compensation benefits. ITT does not contend that these instructions were erroneous. Nor does it contend that there was insufficient evidence to submit them. In addition, our previous recitation of the facts clearly establishes there was sufficient evidence on each element of the bad-faith claim for the district court to submit it to the jury.

The question narrows to whether the evidence that was sufficient to submit the bad-faith claim was also sufficient to submit the punitive-damages claim. For reasons that follow, we think that it was.

As mentioned, to prove "willful and wanton disregard for the rights and safety of another," Gibson had to prove actual or legal malice. We agree with the district court that what is at issue here is legal malice. As we said, legal malice is shown by wrongful conduct committed or continued with a willful or reckless disregard for another's rights. Our cases are

clear that willful and wanton disregard for the rights of another can be shown by the defendant's intentional violation of a statutory right. *See, e.g., Lara v. Thomas,* 512 N.W.2d 777, 782–83 (Iowa 1994).

Here, there was a conclusive finding that ITT had no reasonable basis for its refusal to pay the twenty weeks of workers' compensation benefits to which Gibson was *statutorily* entitled under Iowa Code section 85.34(2)(u). Additionally, the evidence supports a finding that, as early as July 1994, ITT knew Gibson was entitled to the additional twenty weeks. Nevertheless, ITT terminated his benefits one month later. The evidence also supports a finding that ITT knew Gibson was *statutorily* entitled to psychiatric treatments pursuant to Iowa Code section 85.27 and had no reasonable basis to refuse payment but nevertheless chose not to pay for those treatments. We conclude the evidence was sufficient to establish legal malice, *i.e.,* that ITT acted with willful and wanton disregard for Gibson's rights.

Contrary to the district court, we conclude the evidence in this case was sufficient to show that it was "highly probable" harm would follow from ITT's decision not to pay the twenty weeks and not to pay for the psychiatric treatments. Loss of function of the mind and mental pain and suffering accounted for a substantial part of the compensatory damages that the jury awarded for the bad-faith claim. Additionally, the jury awarded Gibson damages for penalties he incurred in withdrawing money early from an IRA account *after* ITT stopped paying benefits. The IRA money was needed to pay bills because ITT was no longer paying Gibson benefits. A jury, using its common sense and experience, could reasonably infer that, as a workers' compensation carrier, ITT was in a position to know there was a high probability its wrongful conduct would result in the kind of harm Gibson suffered.

■ **2. Abuse of process.** Abuse of process is "the use of legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it was not designed." *Fuller v. Local Union No. 106,* 567 N.W.2d 419, 421 (Iowa 1997). An abuse-of-process claim has three elements: (1) the use of a legal process (2) in an improper or unauthorized manner (3) that causes the plaintiff to suffer damages as a result of that abuse. *Id.*

■ "The first element can generally be shown by the use of a legal process against the plaintiff." *Wilson v. Hayes,* 464 N.W.2d 250, 266 (Iowa 1990). As to the second element, "[t]he plaintiff must prove that the defendant used the legal process *primarily* for an impermissible or illegal motive." *Id.*

■ The district court instructed the jury that, as to his abuse-of-process claim, Gibson had to prove the following: (1) ITT intentionally used an answer to Gibson's petition before the Iowa Industrial Commissioner for workers' compensation benefits; (2) ITT used the legal process primarily to prevent Gibson from obtaining psychiatric care at ITT's expense and to prevent Gibson from obtaining a hearing before the Industrial Commissioner on his application for alternate medical care and not for the legal process's (*i.e.,* the answer's) intended use; (3) ITT's use of the legal process for the improper purpose was a proximate cause of Gibson's damage; and (4) the amount of damage.

ITT challenges various aspects of the abuse-of-process claim. For example, it argues that (1) the answer was not filed (or not withdrawn) in order to refuse to pay for psychiatric care, (2) this action was not unreasonable, and (3) Gibson cannot show damage from ITT's failure to pay the psychiatric bills.

■ Because ITT has not appealed from the judgment in favor of Gibson on this claim, it cannot now challenge the judgment. *See Johnson Equip. Corp. v. Indus. Indem.,* 489 N.W.2d 13, 17 (Iowa 1992) (holding that a party need not cross-appeal a trial court's rejection of a ground

urged in the trial court to preserve error on a claim decided in the party's favor but must still cross-appeal to preserve an issue on a claim decided adversely to the party). We reject ITT's contention that it was a successful party on the abuse-of-process claim because the damages for that claim were duplicative of damages for other claims. Under *Johnson,* ITT was the unsuccessful party on the abuse-of-process claim and therefore, had to cross-appeal from the judgment on that claim to preserve error. For this reason, ITT cannot now claim there was insufficient evidence to support submission to the jury of the abuse-of-process claim.

Iowa Code section 85.27 imposes an affirmative duty on the part of the employer and the workers' compensation carrier to furnish reasonable and necessary medical care to an injured employee. *See* Iowa Code § 85.27; *Boylan,* 489 N.W.2d at 743. By its verdict, the jury found that ITT intentionally denied compensability in its answer to Gibson's petition for benefits for the primary purpose of preventing Gibson from obtaining *statutory* benefits, *i.e.,* psychiatric treatment at ITT's expense for his work-related depression. ITT's other purpose was to prevent Gibson from having a hearing—a *statutory right* under Iowa Code sections 17A.12 and 85.27—on his application for alternate medical care before the industrial commissioner. The evidence that allowed the jury to make this finding was sufficient to establish that ITT intentionally violated Gibson's statutory rights. Such conduct, as we earlier noted, is sufficient to constitute willful and wanton conduct, *i.e.,* legal malice, for punitive damages purposes.

The jury allowed compensatory damages for loss of function of the mind and mental pain and suffering on the abuse-of-process claim. Dr. Gutnik was treating Gibson for major depression that was work related. The evidence shows that ITT knew this. From this, the jury could reasonably infer that ITT knew it was highly probable that its conduct could aggravate Gibson's depression and delay improvement of his condition.

For all these reasons, we conclude the district court erred in sustaining ITT's motion for directed verdict as to Gibson's claim for punitive damages. By our discussion we do not mean to imply that in every case evidence sufficient to submit a bad-faith claim or an abuse-of-process claim will be sufficient to support submission of a punitive-damages claim. We must make that determination on a case-by-case basis.

## VI. Motion for Judgment Notwithstanding the Verdict.

Gibson next contends that there was sufficient evidence to submit his claims for intentional interference with a contract and fraudulent misrepresentation. He therefore asserts the district court erred in sustaining ITT's motion for judgment notwithstanding the verdict on these two claims.

**A. Intentional interference with a contract.** The elements of this tort include the following: " '(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.' " *Jones v. Lake Park Care Ctr., Inc.,* 569 N.W.2d 369, 377 (Iowa 1997) (quoting *Nesler v. Fisher & Co.,* 452 N.W.2d 191, 198 (Iowa 1990)).

The district court submitted two items of interference with the contract between Gibson and Dr. Bowman: (1) refusing to pay for the myelogram prescribed by Dr. Bowman and (2) representing to Dr. Bowman that The Garden Café would return Gibson to work in a "light duty" job when ITT knew this representation was false. (ITT does not dispute that an implied contract existed between Gibson and Dr. Bowman. We make no ruling with respect to this issue and simply assume,

without deciding, that such a contract did exist.)

Our review of the evidence convinces us that there was insufficient evidence that ITT's actions regarding the myelogram *caused* Dr. Bowman not to perform his contract with Gibson. Dr. Bowman apparently had decided on his own that a myelogram was not appropriate. Additionally, even after the deputy commissioner had ordered ITT to pay for the myelogram, Dr. Bowman only conducted an MRI, a diagnostic test for which ITT paid.

We likewise conclude the evidence was insufficient to show that ITT had anything to do with influencing Dr. Bowman to release Gibson to work. The evidence shows that Dr. Bowman was independent in his treatment of Gibson. While Dr. Bowman may have been pleased to learn that a light-duty job was allegedly available for Gibson at The Garden Café, the existence of that job was not the reason why Dr. Bowman released Gibson to work.

The evidence only supports a finding that Dr. Bowman released Gibson for light-duty work because the doctor believed that Gibson had received a sufficiently favorable functional-capacity evaluation to enable Gibson to return to work. In other words, Dr. Bowman's decision to release Gibson was premised on his conclusion that Gibson was fit to work light-duty jobs of the type supposedly available at The Garden Café. We are not convinced the evidence supports the conclusion that Dr. Bowman would not have released Gibson had Dr. Bowman known a light-duty job was not available at The Garden Café.

We conclude the district court correctly granted ITT's motion for judgment notwithstanding the verdict on this claim.

■ **B. Fraudulent misrepresentation.** To establish a claim of fraudulent misrepresentation, a plaintiff must prove (1) defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in reli-

ance on the truth of the representation and was justified in relying on the representation, (7) the representation was a proximate cause of plaintiff's damages, and (8) the amount of damages. *See Midwest,* 585 N.W.2d at 738.

■ The district court instructed the jury that to recover on this claim Gibson had to prove all of the following: ITT, through McMullen, made a representation to Dr. Bowman that The Garden Café would return Gibson to work in a "light duty" job; that the representation was false; that the representation was material; that ITT knew the representation was false; that ITT intended to deceive Dr. Bowman; that Dr. Bowman acted in reliance on the truth of the representation and was justified in relying on the representation; and that the representation was a proximate cause of Gibson's damage.

ITT makes no contention that the evidence was insufficient to support this claim because the representation was not made to Gibson. ITT also makes no contention that there was insufficient evidence that Gibson relied on the representation. We therefore pass on these issues.

ITT, however, did assert in its motion for directed verdict and in its motion for judgment notwithstanding the verdict that there was no evidence Dr. Bowman relied on McMullen's statements. We agree with the district court's response to this assertion in its ruling on the motion for judgment notwithstanding the verdict:

> There is insufficient evidence in the record that Dr. Bowman acted in reliance upon the truth of the information in making his evaluation. Bowman did receive information as to the availability of the light duty job from Lee McMullen. *However, it is clear that his release of the plaintiff was based upon his evaluation of the plaintiff's physical condition rather than the availability of the work for the plaintiff.*

(Emphasis added.)

We conclude the district court correctly granted ITT's motion for judgment notwithstanding the verdict on this claim.

## VII. Disposition.

Because there was sufficient evidence to submit Gibson's claim for punitive damages to the jury, we conclude the district court erred in sustaining ITT's motion for directed verdict on this issue. We therefore reverse and remand for new trial.

The district court, however, correctly sustained ITT's motion for judgment notwithstanding the verdict as to Gibson's claims for intentional interference with a contract and fraudulent misrepresentation. We therefore affirm on these issues.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**