# IN THE COURT OF APPEALS OF IOWA

No. 15-0779
Filed October 12, 2016

**ABIGAIL FREDERICKSEN,**
        Plaintiff-Appellant,

**vs.**

**JENNIFER OLSEN, ESQ., in her individual capacity; JENNIFER OLSEN, ESQ., in her capacity as the Court appointed Guardian and Custodian of Plaintiff's Infant daughter, acting under color of State law; A.M. and B.M., a married couple,**
        Defendant-Appellees.
_____

        Appeal from the Iowa District Court for Scott County, Paul L. Macek, Judge.


        The biological mother appeals the district court's grant of summary judgment in favor of her former attorney and the adoptive parents.  **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**


        Harold J. Cassidy of The Cassidy Law Firm, Shrewsbury, New Jersey, and Kenneth L. Butters Jr. of Brick Gentry, P.C., West Des Moines, for appellant.

        Robert V.P. Waterman Jr. and Andrea D. Mason of Lane & Waterman L.L.P., Davenport, for appellee Jennifer Olsen.

        Deborah M. Tharnish of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, and Ralph W. Heninger of Heninger and Heninger, P.C., Davenport, for appellees A.M. and B.M.

        Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Abigail Fredericksen appeals from the district court's grant of summary judgment in favor of Jennifer Olsen—an attorney involved with the termination of her parental rights and adoption of Fredericksen's biological child—and A.M. and B.M.—the couple who adopted the child. Fredericksen maintains the district court wrongly dismissed her claims against Olsen for legal malpractice, tortious interference with custody, and civil conspiracy to commit fraudulent inducement. Additionally, she maintains the district court erred in dismissing her claims against A.M. and B.M. for civil conspiracy to commit fraudulent inducement and tortious interference with custody. Lastly, Fredericksen maintains that "under the unique facts of this case, [her] constitutional rights were violated" because she was deprived, through fraud and misrepresentation, of her constitutional right to parent her child.

**I. Background Facts and Proceedings.**

In July 2011, when she was still a minor, Fredericksen learned she was pregnant and due to give birth in February 2012. Sometime later, Fredericksen disclosed to her parents and the child's father that she was pregnant. Fredericksen would be eighteen years old by the time of the child's birth.

Fredericksen's parents accompanied her to a pregnancy help center, where Fredericksen met with a counselor. At the center, the idea of placing the child for adoption was raised. Afterward, Fredericksen began thinking about an "open adoption." Fredericksen understood an "open adoption" to mean she would have continued contact, and could have some type of ongoing relationship, with the child.

The center gave Fredericksen a list of attorneys who had professional experience with adoptions; from the list, Fredericksen found and contacted Olsen. Fredericksen first met with Olsen in August 2011. Olsen met with Fredericksen, the biological father, and both of their families several times.

In September, A.M. and B.M. reached out to Fredericksen and told her they were interested in adopting the child.[1] They continued to have discussions about the possibility of A.M. and B.M. adopting the child; during their conversations, A.M. and B.M. assured Fredericksen she would be able to maintain a relationship with the child. Fredericksen asserts A.M. and B.M. never intended to allow her to have an ongoing relationship with the child.

After her discussions with A.M. and B.M., Fredericksen met with Olsen and expressed her wish to pursue an open adoption. The biological father was supportive of Fredericksen's desire for an open adoption, and he also met with Olsen to discuss the process. At some point, Olsen told Fredericksen the ongoing contact and relationship Fredericksen understood to be part of an open adoption were not enforceable terms.

In December 2011, Fredericksen and the biological father told A.M. and B.M. they would like them to adopt the child in an open adoption. Around the same time, Fredericksen told Olsen she had "decided to work with A.M. and B.M."

Fredericksen and the biological father maintained contact with A.M. and B.M. throughout Fredericksen's pregnancy. Both Fredericksen and the biological

---

[1] Fredericksen talked to A.M.'s mother at church about her decision to place the child for adoption. Evidently, A.M.'s mother told A.M. about Fredericksen and the child.

father spent time with A.M. and B.M. going to restaurants and talking; Fredericksen felt they were friends.

Sometime in the days leading up to the birth of the child, in mid-February 2012,[2] Olsen sent Fredericksen and the biological father the "hospital adoption plan," which stated Olsen would need to meet with them after the child's birth to sign some "legal documents to assist in the finalization of the adoption." The plan outlined that Fredericksen would sign "all necessary paperwork prior to her discharge. (i.e. release of information, release of baby to Attorney Olsen and the temporary custody agreement)."

The child was born on February 15.

Fredericksen and the child were discharged from the hospital on February 18. Fredericksen gave the child to A.M. and B.M. in the hospital parking lot.

Between February 17 and February 21, Fredericksen began to believe that A.M. resented Fredericksen's ongoing contact and relationship with the child. After A.M. took the child, she restricted Fredericksen's access to the child by not allowing Fredericksen to visit the child as often or for as long as Fredericksen wished.

However, on February 20, Fredericksen and the child's biological father signed a release of custody in a meeting with Olsen. The release advised that they had ninety-six hours to revoke the release, and if they did not do so, a petition to terminate each of their parental rights would be filed soon thereafter. Olsen assumed legal custody of the child pursuant to the terms of the release.

---

[2] The letter attached to the "hospital adoption plan" is dated February 10 while the plan itself is dated February 11. Fredericksen maintains she received the document on February 14.

On February 22, Fredericksen met with A.M. and B.M. Fredericksen presented a document entitled "expectations of the future," in which she explained her understanding of the parties' arrangement and how it would work going forward. A.M. and B.M. agreed Fredericksen would continue to be a part of the child's life.

On February 24, Olsen, as the guardian and custodian of the child, filed a petition for the termination of Fredericksen's and the biological father's parental rights. The petition stated Fredericksen and the biological father "[did] not object to the termination after having been given proper notice and opportunity to object." The same day, the court set a hearing on the petition for March 6.

On March 2, Fredericksen accepted service and notice of the petition to terminate her parental rights and notice of the scheduled termination hearing.

Fredericksen continued to have contact with the child until March 3, when A.M. and B.M. left with the child to return to their home in Texas.

On March 6, following the hearing on the petition, the court terminated Fredericksen's parental rights. Olsen appeared as guardian and custodian of the child; another attorney appeared as guardian ad litem. Neither Fredericksen nor the biological father chose to attend the hearing.

According to Fredericksen, within a couple of weeks of returning to Texas, A.M. and B.M. began to restrict or cut-off communication with Fredericksen. A.M. and B.M. stopped allowing Fredericksen access to their Facebook page, which she had used to see pictures of the child. Fredericksen expressed her dissatisfaction, but A.M. and B.M. did not provide her access.

Fredericksen and her mother told A.M. they wanted the child returned. On March 30, according to Fredericksen, A.M. called Fredericksen and said she should take the child back. Fredericksen agreed she would do so, and she contacted Olsen to request her to do whatever needed to be done for the return of the child. On April 2, Olsen told Fredericksen she could not legally have the child returned to her because Olsen had talked to the biological father and he refused to consent to it.[3]

Eventually, Fredericksen was given some access to see photos of the child on Facebook. According to Fredericksen, she was only allowed to visit the child on May 13, 2012, and one time in late 2013.

On August 30, 2012, Fredericksen's new attorney, Rebecca Sharpe, sent A.M. and B.M. a letter. In it, Sharpe stated she had been retained by Fredericksen and had "been in frequent contact with [Fredericksen] . . . over the last few months." The letter stated that A.M. and B.M. had failed to follow through with the agreement they had with Fredericksen and Fredericksen was "prepared to take this matter to the highest court in the land to overturn the termination of her parental rights."

Notwithstanding, Fredericksen took no action to set aside the judgment or intervene in the adoption, which was finalized in Texas in November 2012.

---

[3] Fredericksen asserts the biological father never made such a statement to Olsen. However, in her recitation of the facts, she states that after Olsen told her the biological father made such a statement, Fredericksen and her parents "visited [the biological father] and his family. They begged them to agree to allow [Fredericksen] to take custody of [the child]. [The biological father] and his family declined."

Fredericksen filed the present suit on February 19, 2014. In February 2015,[4] Olsen, A.M., and B.M. filed motions for summary judgment.

The district court held a hearing on the motions on March 13, 2015. Following the hearing, the district court granted Olsen's and A.M. and B.M.'s motions for summary judgment in their entirety and dismissed each of Fredericksen's claims.

Fredericksen appeals.

## II. Standard of Review.

On review of summary judgment rulings, we review for errors of law. *Bass v. J.C. Penney Co.*, 880 N.W.2d 751, 755 (Iowa 2016). We view the entire record in the light most favorable to the nonmoving party, making every legitimate inference that the evidence in the record will support in favor of the nonmoving party. *Id.* Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "'An issue of fact is 'material' only when the dispute involves facts which might affect the outcome of the suit, given the applicable governing law.'" *Nelson v. Lindaman*, 867 N.W.2d 1, 6 (Iowa 2015) (citation omitted).

"We review legal issues necessary for resolution of the constitutional claims presented within the context of the summary judgment proceeding de novo." *Varnum v. Brien*, 763 N.W.2d 862, 874 (Iowa 2009).

---

[4] In the interim, the case was removed to federal court. The federal court determined it did not have subject matter jurisdiction, and the case was remanded to the state court.

**III. Discussion.**

    **A. Legal Malpractice.**

    Fredericksen maintains the district court erred in granting Olsen's motion for summary judgment and dismissing Fredericksen's claim of legal malpractice against Olsen. Fredericksen maintains the district court incorrectly decided Fredericksen's injury—the loss of her parental rights—was not a direct result of Olsen's negligence. In the alternative, Fredericksen maintains there is a genuine issue of material fact, which prevents summary judgment from being proper on this claim.

    "To establish a prima facie claim of legal malpractice, the plaintiff must produce evidence showing the attorney's breach of duty caused 'actual injury, loss, or damage.'" *Vossoughi v. Polaschek*, 859 N.W.2d 643, 649 (Iowa 2015) (citation omitted). "An attorney breaches the duty of care owed to the client when the attorney fails to use 'such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the task which [is undertaken].'" *Schmitz v. Crotty*, 528 N.W.2d 112, 115 (Iowa 1995) (alteration in original) (citation omitted). To establish causation, the plaintiff must establish the attorney's breach was the cause in fact of the damage and the damages were within the scope of liability. *See Thompson v. Kaczinski*, 774 N.W.2d 829, 838–39 (Iowa 2009).

    Here, the district court, viewing the evidence in the light most favorable to Fredericksen, found there was an attorney-client relationship between Olsen and

Fredericksen,[5] and Olsen breached[6] her duty to Fredricksen. However, the court determined summary judgment dismissing the Fredericksen's claim of legal malpractice was appropriate because any breach by Olsen was not the proximate cause of Fredericksen's damages, namely the loss of her parental rights and relationship with the child.

The court cited *Ruden v. Jenk*, 543 N.W.2d 605, 611 (Iowa 1996), for the proposition that an attorney's negligence cannot be the proximate cause of a plaintiff's damages when the plaintiff hired a new attorney within the statutory limitations to appeal or correct the issue. Fredericksen maintains the present facts are distinguishable from *Ruden* because "no action by a subsequent attorney could eliminate the harm or even greatly reduce [it]." She argues the applicable statute of limitations in her case was the thirty-day period following the order terminating her rights, which is the time limit for motions to vacate the termination order under Iowa Code section 600A.9 (2). We agree. The facts here show that Olsen gave incorrect advice to Frederickson when A.M. and B.M. were prepared to return the child to Frederickson within the thirty-day period. Frederickson relied on the advice that the baby could not be returned unless the biological father agreed, as indicated by the family's visit to him.

---

[5] Olsen characterizes herself as an "adoption facilitator," apparently to justify her advising the biological mother and father and their families, the adoptive parents (who paid her fees), and becoming custodian of the child.
[6] Based on both Fredericksen's and the district court's recitation of the facts, there were multiple times throughout the proceedings when Olsen could have advised Fredericksen differently or Fredericksen could have contested or revoked her consent for the termination. We focus on Fredericksen's allegation Olsen told her on April 2, 2012—three days before the deadline to have the court vacate the termination order pursuant to section 600A.9(2) (2011)—there was nothing that could be done legally to have the child returned to Fredericksen.

Fredericksen's parental rights were terminated on March 6, 2012. The thirty days to vacate the order had passed before Fredericksen hired new counsel. *See* Iowa Code § 600A.9(2) (stating that if a termination order is granted, "the juvenile court shall retain jurisdiction to change a guardian or custodian and to allow a terminated parent or any putative biological parent to request vacation or appeal of the termination order which request must be made within thirty days of issuance of the granting of the order."). The statute does not outline the bases for vacating the order, other than the requirement that vacating the order be in the child's best interests, and case law does not indicate any other finding the district court must make. *See, e.g., In re E.C.G.*, 345 N.W.2d 138, 141 (Iowa 1984) (stating the "standard for granting a motion to vacate termination of parental rights under section 600A.9(2) is 'the best interests of the child'"); *In re Adoption of M.M.B.*, 376 N.W.2d 900, 902 (Iowa 1985) (stating section 600A.9(2) allows a parent whose rights have been terminated to seek to have the court vacate the order and the court may grant the order only if it is in the child's best interests). Although Fredericksen had new representation by August 30, 2012,[7] within the one-year period during which the court can "correct, vacate, or modify a final judgment" if there was "irregularity or fraud practiced in obtaining it," Iowa Rs. Civ. Pro. 1.1012, 1.1013, Fredericksen had a greater burden after the thirty-day period expired and less likelihood of mitigating the harm of the termination of her parental rights.

---

[7] The new attorney, Sharpe, sent a letter on behalf of "[her] client" Fredericksen to A.M. and B.M. on August 30, 2012. In the letter, Sharpe indicated she had "been in frequent contact with Ms.Fredericksen over the last few months."

To get the order vacated on April 2, 2012, when Fredericksen alleges she told Olsen to do anything necessary to get the child back, Fredericksen only needed to establish that the court's vacation of the order would be in the best interests of the child. *See* Iowa Code § 600A.9(2) ("The juvenile court shall grant the request only if it is in the best interest of the child."). Based on the facts alleged by Fredericksen, that A.M. and B.M. were willing to return the child and Fredericksen and her parents were ready and able to take the child into their home, we believe the district court might have granted the request.

But to have the termination order vacated under Iowa Rule of Civil Procedure 1.1012, Fredericksen had the burden to establish it was in the best interests of the child and that termination had been obtained using extrinsic fraud. *See In re Adoption of B.J.H.,* 564 N.W.2d 387, 392 (Iowa 1997) ("Although proof of extrinsic fraud would ordinarily by itself be sufficient under rule [1.1012] to support vacation of a judgment, an additional requirement must be imposed where an adoption decree is the judgment to be vacated. When the adoption of a child is involved, the court must consider the best interests of the child."). Moreover, we believe her burden of establishing that the vacation of the order was in the best interests of the child would have been more difficult approximately six months after A.M. and B.M. began caring for the child than it would have been on April 2, 2012. *See, e.g.,* Iowa Code § 232.116(1)(h) (allowing courts to terminate parental rights after a child under the age of three has been out of the physical custody of the parent for six months); *In re Marriage of Weidner*, 338 N.W.2d 351, 360 (Iowa 1983) (focusing on the importance of stability in the lives of young children).

Although the causation language in *Ruden* indicated the harm caused by the attorney's mistaken advice is reparable until the statute of limitations expires on attorney malpractice, the same is not true for a situation involving child custody—a harm not compensable by money damages. Here, all parties had reached a decision to vacate the termination of parental rights decision within the thirty-day window of Iowa Code section 600A.9(2) and to return the child to its biological mother. But for Olsen's mistaken advice and her lack of action on the Fredericksens' request, the court may have vacated the termination order. In other words, we believe the causation language of *Ruden* would only be applicable here if Fredericksen hired the second attorney before the thirty-day window to vacate the termination order closed. 543 N.W.2d at 612 (noting the first attorney's negligence is not the proximate cause of damages if the successor attorney is hired at a time when the action is not barred). Although Fredericksen retained an opportunity to challenge the termination order after the thirty days, the type of challenge available to her and the burden she had to carry to sustain that challenge had increased dramatically.

It is not clear whether the events took place as Fredericksen alleges.[8] It is also unclear whether there was an attorney-client relationship between Olsen and Fredericksen.[9] Moreover, material facts include communication with A.M. and B.M., communication with Olsen, and the sequence of these conversations.

---

[8] As the district court noted, "Defendants filed their statements of undisputed facts. Plaintiff filed her Statement of Disputed and Other Material Facts. This was not precisely a statement of facts which Plaintiff disputed. Instead, it was a recitation of 'facts' from Plaintiff's perspective."

[9] Fredericksen and Olsen each filed an affidavit from an expert; Fredericksen's asserted there was an attorney-client relationship between the two parties, while Olsen's asserted Olsen worked as a facilitator, as "is the normal custom and practice in Iowa."

For these reasons, we believe there is a genuine issue of material fact regarding whether Olsen's alleged inaction was the cause of harm to Fredericksen. *See Crookham v. Riley*, 584 N.W.2d 258, 265 (Iowa 1998) ("It is well established the questions of negligence, contributory negligence, and proximate cause are generally for the jury and only in exceptional cases can they be decided as a matter of law."). As such, the district court erred in granting summary judgment and dismissing Fredericksen's claim against Olsen for legal malpractice.

**B. Civil Conspiracy to commit Fraudulent Inducement.**

*1. Olsen.* Fredericksen maintains the district court erred in granting summary judgment for Olsen and dismissing Fredericksen's claim of civil conspiracy to commit fraudulent inducement.

Under Iowa law, "[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful." *Wright v. Brooke Grp., Ltd.*, 652 N.W.2d 159, 171 (Iowa 2002) (alteration in original) (citation omitted). "Under this theory of liability, 'an agreement must exist between the two persons to commit a *wrong* against another.'" *Id.* at 172 (citation omitted). However, civil conspiracy is not in itself actionable. *Id.* In other words, there must be an underlying, actionable claim for an independent tort. *See id.*

The district court dismissed Fredericksen's claim against Olsen because she failed to plead the claim of fraudulent inducement. *See Hanson v. Lassek*, 154 N.W.2d 871, 873 (Iowa 1967) ("[T]he functions of a pleading are to put the other party on notice of what the pleader intends to prove at trial [a]nd to define the issues. . . . [A]ny relief granted must be consistent with the case made by the

pleading . . . ." (citation omitted)); *see also Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997) (stating plaintiff's claims that were not included in the complaint failed and could not be added at the summary judgment stage because it was "too late in the day to be adding new claims"). We find no error in the district court's decision.

*2. A.M. and B.M.* Fredericksen maintains the district court erred in granting summary judgment for A.M. and B.M. and dismissing her claim against them for civil conspiracy to commit fraudulent inducement.[10]

To establish a common-law claim for fraudulent inducement, the plaintiff must establish:

> (1) defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation, (7) the representation was a proximate cause of plaintiff's damages, and (8) the amount of damages.

*Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001).

The district court dismissed Fredericksen's claim because it found she could not have reasonably or justifiability relied on any promises made by A.M. and B.M. regarding an "open adoption" and ongoing contact between her and the child. Fredericksen admitted Olsen advised her open adoptions are not enforceable. Notwithstanding, Fredericksen continues to maintain she should be

---

[10] A.M. and B.M. claim this issue is not preserved for our review because Fredericksen does not include a heading in her brief specifically stating she is challenging the district court's ruling on her claim for fraudulent inducement. While the Iowa Rules of Appellate Procedure require an appellant to present each issue for our review numbered and stated separately, we decline to take such a Draconian approach to error preservation. *See* Iowa R. App. Pro. 6.903(2)(c) (requiring the appellant's brief to contain a statement of the issues presented for review, with each issue numbered and stated separately).

allowed to recover damages because she did, in fact, believe A.M. and B.M and made a decision based on their statements. However, even if Fredericksen believed and relied on the statements made by A.M. and B.M., "plaintiffs who close their eyes to a known or obvious danger that a statement is fraudulent cannot recover losses they suffer from reliance on it." Restatement (Third) of Torts: Liab. For Econ. Harm § 11 cmt. d (Am. Law Inst., Tentative Draft No. 2, 2014); *see also Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 738 (Iowa 2009) ("This approach is consistent with the established view that the justifiable-reliance element means a plaintiff cannot close his or her eyes to an obvious contradiction.").

We agree with the district court that even if A.M. and B.M. intentionally lied to Fredericksen regarding the promise of ongoing contact with the child, because Fredericksen knew that such promises were unenforceable, she cannot have justifiably relied on such promises. As such, Fredericksen's underlying claim of fraudulent inducement fails as a matter of law, and the district court properly dismissed the claim of civil conspiracy to commit fraudulent inducement.

**C. Tortious Interference with Custody.**

Fredericksen maintains the district court erred in granting the defendants' motions for summary judgment and dismissing Fredericksen's claims of tortious interference with custody.

To establish a prima facie claim of tortious interference with custody, the plaintiff must show:

> (1) the plaintiff has a legal right to establish or maintain a parental or custodial relationship with his or her minor child; (2) the defendant took some action or affirmative effort to abduct the child

or to compel or induce the child to leave the plaintiff's custody; (3) the abducting, compelling, or inducing was willful; and (4) the abducting, compelling, or inducing was done with notice or knowledge that the child had a parent whose rights were thereby invaded and who did not consent.

*Wolf v. Wolf*, 690 N.W.2d 887, 892 (Iowa 2005). Here, the district court found that this cause of action was not applicable to any of the defendants because, at the time they took the child, Fredericksen had signed a release consenting to the removal of the child from her care and custody.

Fredericksen maintains this cause of action is applicable in cases such as hers, where the defendants' tortious actions are meant to lead to the termination of a parent's rights. As such, she maintains the district court was wrong to rely on her consent to defeat her claim. She asserts the consent was invalid because she was fraudulently induced into giving up her parental rights. Without valid consent, she maintains the defendants' taking of the child was an abduction or kidnapping, which is actionable under tortious interference with custody.[11]

However, Fredericksen has not established that is what happened in her case. As stated above, Fredericksen did not plead a claim of fraudulent inducement against Olsen. Moreover, her claims for fraudulent inducement against A.M. and B.M. fail for the reason stated above.

---

[11] Although we have not found a case where the cause of action was applied in the situation described by Fredericksen, we believe it is a fair reading. In *Wolf*, the supreme court stated that the common-law claim of tortious interference had since been codified in chapter 710 (2001), which is in the section of the code on "kidnapping and other related offenses." The definition of kidnapping contemplates that one may "seize or take away (a person) by force *or fraud*." *Kidnap*, *Black's Law Dictionary* (10th ed. 2014) (emphasis added). In a case where the parent consents to the taking of the child, but the consent is the result of fraud, we believe the cause of action for tortious interference with custody is applicable.

Because Fredericksen cannot establish she was fraudulently induced to consent to the revocation of custody and the termination of her rights, the district court properly concluded Fredericksen's claims for tortious interference with custody cannot stand.

**D. Unconstitutional As Applied.**

Fredericksen maintains the order terminating her parental rights was unconstitutional. She asserts that she is not facially or categorically challenging the statute but rather is claiming, "under the unique facts of this case," her constitutional rights were violated.

Fredericksen argues the order terminating her parental rights is void because her waiver of her constitutional right to have a relationship with her child was not knowing and voluntary. "The interest of parents in their relationship with their children is a fundamental liberty interest protected by the Fourteenth Amendment." *In re B.G.C.*, 496 N.W.2d 239, 244 (Iowa 1992).

Although Fredericksen characterizes her decision to consent to the termination as uninformed, the record establishes she was consistently provided the necessary, correct information throughout the period of time leading up the termination of her rights.

On February 11, 2012, four days before the child's birth, Olsen sent Fredericksen the "hospital adoption plan," which stated Olsen would need to meet with Fredericksen after the child's birth to sign some "legal documents to assist in the finalization of the adoption." The plan outlined that Fredericksen would sign "all necessary paperwork prior to her discharge. (I.e. release of information, release of baby to Attorney Olsen and the temporary custody

agreement)." Additionally, it provided, "Baby will be discharged to the Attorney, for placement with the adoptive couple. This is a legal risk placement case as the adoptive couple will accept child at discharge and care for child during the 96 hour period prior to legal action."

On February 20, Fredericksen signed a release of custody. The release included the following provisions:

> I have been further advised and understand that Jennifer Olsen will immediately Petition the Juvenile Court in and for Scott County, Iowa, for [her] appointment as Guardian and Custodian of said child.
>
> I have been further advised and understand that the signing of this Release shall be followed, within a reasonable time, by the filing of a Petition for Termination of Parental Rights under Section 600A.5 of the 2011 Code of Iowa.
>
> I have been further advised and understand that the purpose of this Release is to permit said child to be placed for adoption.
> . . . .
> I have been further advised and understand that if this Release is not revoked as hereinafter set forth, it may be grounds for termination of the parent-child relationship currently existing between said child and myself.
>
> I have been further advised and understand that I may, at any time prior to the entry of an Order terminating parental rights, request the Juvenile Court in and for Scott County, Iowa to Order the revocation of this Release of Custody by filing such request with said Court at Juvenile Court Services, . . . If such request is made within ninety-six (96) hours of the time I signed this Release of Custody, said Juvenile Court shall order this Release revoked. Otherwise, said Juvenile Court shall order this Release revoked only upon clear and convincing evidence that good cause exists for revocation. Good cause for revocation includes but is not limited to a showing that the Release was obtained by fraud, coercion, or misrepresentation of law or fact which was material to its execution. In determining whether good cause, other than fraud, coercion or misrepresentation exists for revocation, said Juvenile Court shall give paramount consideration to the best interests of the child and due consideration to the interests of the parents of the child and of any person standing in the place of the parents.

Four days later, after the ninety-six hour to revoke had passed, Olsen filed a petition for the termination of Fredericksen's parental rights. The petition stated Fredericksen "[did] not object to the termination after having been given proper notice and opportunity to object."

The same day, the court set a hearing on the petition for March 6.

On March 2, Fredericksen accepted service and notice of the petition to terminate her parental rights and the termination hearing. Fredericksen chose not to attend the hearing.

As we have stated above, Fredericksen was aware throughout the process that after she consented to the termination of her rights, there was no way to enforce the promises made to her by A.M. and B.M. regarding her future contact with the child. Thus, regardless of her subjective belief, she was informed of the lack of enforcement mechanism throughout. Additionally, as the facts above establish, she was also informed of the process involved with the release of custody and what she needed to do to revoke or undo the process within ninety-six hours, in order to forestall the termination of her parental rights. Even if Fredericksen did not read the documents she signed, we impute such knowledge to her, as she is bound by the documents she signed. *See, e.g., Joseph L. Wilmotte & Co. v. Rosenman Bros.*, 258 N.W.2d 317, 323 (Iowa 1977) (stating a party is generally "bound by the documents [the party] signs even though . . . it has not expressly accepted all of the contract provisions or is even aware of them"); *Preston v. Howell*, 257 N.W. 415, 418 (Iowa 1934) ("It is also the settled rule of law that if a party to a contract is able to read, has the opportunity to do so, and fails to read the contract, he cannot thereafter be heard

to say that he was ignorant of its terms and conditions, for the purpose of relieving himself from its obligation.").

In considering whether Fredericksen's waiver was voluntary, we acknowledge the Nebraska case cited by Fredericksen, which found that parents who signed a relinquishment of their parental rights after being "led to believe that they could continue to see their son following an adoption" had been coerced by the promise of the "open" adoption. *McCormick v. State*, 354 N.W.2d 160, 161–62 (Neb. 1984); *see Monty S. v. Jason W.*, 863 N.W.2d 484, 488 (Neb. 2015) (noting the district court had "found that the open adoption agreement itself acted as coercion and invalidated the relinquishments"). No party has provided a case from Iowa where the promise of an "open adoption" has been found to be coercive, and we are not persuaded that any promises made to Fredericksen rise to that level. *See Coercion*, *Black's Law Dictionary* (10th ed. 2014) ("Compulsion of a free agent by physical, moral, or economic force or threat of physical force.").

Here, we agree with the district court that Fredericksen's waiver of her parental rights was knowing and voluntary, and as such, there was no unconstitutional application of Iowa Code chapter 600A in this case.

**IV. Conclusion.**

Because there is a genuine issue of material fact regarding whether Olsen's alleged inaction was the cause of harm to Fredericksen, the district court erred in granting summary judgment in favor of Olsen and dismissing Fredericksen's claim of legal malpractice. We reverse on that claim.

We affirm the district court's ruling on all other claims.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**