**Ida NASSEN, Appellee,**

v.

**NATIONAL STATES INSURANCE COMPANY, Appellant.**

**No. 91–880.**

Supreme Court of Iowa.

Dec. 23, 1992.

Rehearing Denied Jan. 22, 1993.

Mark D. Sherinian and Thomas D. Hanson of Hanson, Bjork & Russell, Des Moines, for appellant.

Barry J. Nadler of Newbrough, Johnston, Brewer, Maddux & Nadler, Ames, for appellee.

Considered by LARSON, P.J., and SCHULTZ, CARTER, LAVORATO, and NEUMAN, JJ.

CARTER, Justice.

Defendant, National States Insurance Company (National States), appeals from an adverse judgment in an action alleging that it had acted in bad faith in its denial of a claim by plaintiff, Ida Nassen, under a policy of nursing home insurance. Plaintiff has cross-appealed from the district court's order for a remittitur of $40,000 of the verdict, which included actual damages totaling $123,000 and punitive damages of $500,000. After reviewing the arguments presented by the parties, we affirm the district court's judgment in all respects.

In April of 1988, plaintiff, then eighty-five, purchased a nursing home insurance policy from National States. The policy was sold to her by Kenneth Phillips, an independent insurance agent. Phillips filled out the application form after asking plaintiff about her medical history. She told him that she had been hospitalized for three days for a bowel obstruction in November 1987, but had not needed surgery. Plaintiff's application was sent to National States and approved by its underwriter, Dedra Patton. A policy of nursing home insurance was issued to plaintiff on April 28, 1988.

At the time of plaintiff's three-day hospitalization in November 1987, the admitting physician had noted the possibility of confusion and hypothyroidism on her admission form. She was found to have a low thyroid value and was placed on a "very small dose of thyroid" by her regular physician, Dr. Anderson. His tests did not indicate hypothyroidism, and he noted that the plaintiff was not at all confused while under hospital observation. Dr. Anderson testified at the trial that when dictating his medical notes he noted that both the confusion and hypothyroidism diagnoses were unconfirmed.

Plaintiff was hospitalized for five days in June 1988, with uncontrolled diabetes, mild hypothyroidism, and mild dementia. Upon release from the hospital, she was admitted to a nursing home. Irene Crippen, plaintiff's good friend and attorney in fact, submitted a completed and signed claim for nursing home benefits to National States on plaintiff's behalf on July 6, 1988. During the months of August and September, Crippen called National States a number of times but did not get a response. On October 3, National States sent Crippen a letter asking for another signed claim form. They received the form and a letter from Crippen on October 10. On October 21, National States sent Crippen a letter requesting another signed claim form. By that time, Crippen was liquidating plaintiff's assets to pay for her care at the nursing home.

On November 5, Crippen sent the third signed claim form, requested by National

States. On November 8, the insurance company sent another letter to Crippen requesting yet another signed claim form. Crippen responded advising the insurance company that she had already sent three completed and signed claim forms and asked if they were giving her the "runaround."

During the last week of January 1989, Crippen again called National States to inquire about plaintiff's claim. The company returned her call the next week and told her that it was still waiting for a doctor's report. That report was sent to National States and received by it on February 7, 1989.

Crippen ultimately contacted attorney Donald Newbrough on plaintiff's behalf. He wrote to National States in March inquiring if they needed more information. In a letter dated March 15, the head of the nursing home division responded that the company was still waiting for Dr. Anderson's report, which the company had in fact received on February 7.

On April 4, 1989, National States wrote to Newbrough informing him that its investigation revealed that the application for the policy was inaccurate and incomplete. The letter stated specifically that her health history relating to chronic confusion and hypothyroidism were not listed and that, had the company known of these conditions, the policy would not have been issued. One of Newbrough's associates sent a letter to National States advising it that Dr. Anderson had furnished a report to the insurance company indicating that plaintiff did not have chronic confusion or hypothyroidism before the date of her application. National States then returned plaintiff's premium for the policy and purported to rescind the policy retroactive to the date of its issuance.

Plaintiff filed this action alleging breach of contract, insurance bad faith, and fraudulent misrepresentation. The jury found for the plaintiff on all counts. They re- turned a special verdict awarding damages of $43,800 for breach of contract, $40,000 for bad faith, $40,000 for fraudulent misrepresentation, and $500,000 in punitive damages.

On the punitive damage verdict, the jury found that National States had acted in willful or wanton disregard for plaintiff's rights but that its conduct was not directed specifically at her. This relegated the bulk of that award to the civil reparations fund pursuant to Iowa Code section 668A.1(2)(b) (1991). In response to posttrial motions filed by National States, the district court ultimately ordered a remittitur of the $40,000 verdict on the fraud claim. Plaintiff accepted the remittitur. Other facts that bear on the issues presented will be discussed in our consideration of the legal arguments of the parties.

## I. *Admissibility of Testimony of Witness, Marshall Reavis.*

First among National States' claims of error is a challenge to the opinion testimony of plaintiff's expert witness, Marshall Reavis, indicating that National States was engaging in "cash flow underwriting" and "postclaim underwriting." This witness, who has a Ph.D. in insurance risk management, had reviewed data on National States contained in a nationally recognized insurance industry rating service.[1] Comparisons had been made of National States' premiums and those of other insurance companies selling nursing home policies with allegedly similar coverages. In addition, this witness had studied the company's underwriting and claims management practices as shown in company manuals and memorandums and had reviewed deposition testimony of key National States' employees concerning those practices.

After reviewing all of those materials, Mr. Reavis concluded that the company's practices reflected a broad plan to run

---

1. This witness was age 58 at the time of trial and had received a Ph.D. in insurance risk management from the University of Georgia in 1975. Prior to that time, he had worked in the field of insurance underwriting for 17 years. His post- doctorate activities have included teaching at De Paul University, Eastern Kentucky University, and the University of Illinois. His specific research areas have included fraudulent practices by insurance underwriters.

large amounts of cash through the company that could be invested and ultimately paid out to the company's principals prior to its collapse from an unreasonably low premium structure. He labeled this practice as "cash flow underwriting." Mr. Reavis expressed the view that the premium charged by National States for its nursing home insurance was less than a third of that charged by other companies for similar coverage.

In reviewing National States' underwriting practices, Mr. Reavis concluded that its quotas for underwriters amounted to reviewing eighty-five applications per day. He concluded that this would necessarily result in the rubber-stamping of policy applications with no serious effort to weed out high-risk applicants. The witness opined that there was virtually no chance the premiums charged by National States would be adequate to cover its claims and administrative costs on the policies sold. This factor, coupled with the company's seemingly deliberate delay in processing claims, led the witness to conclude that the company was applying "postclaim underwriting." He described "postclaim underwriting" as an attempt to rescind policies after claims have been made.

National States' principal objection to this testimony was based on Iowa Rule of Evidence 406, which provides:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

National States argues that Mr. Reavis failed to consider a sufficient number of claims that it had denied to warrant admission of evidence of routine practice under rule 406.

We do not believe that the admissibility of the challenged evidence is governed by rule 406. That rule relates to evidence of routine practice for purposes of permitting a fact finder to conclude that conduct in a particular instance was in conformity with

that practice. Plaintiff did not offer the challenged evidence for this purpose. She offered it, rather, as data upon which this expert witness might formulate his opinions concerning the company's insurance underwriting practices.

Rule 406 does not affect those rules of evidence that govern expert opinion testimony. Iowa Rule of Evidence 702 allows the admission of expert opinions if such opinions will assist the trier of fact in understanding the evidence or in determining certain factual issues. Rule 703 governs the bases upon which an expert opinion may be premised. It provides:

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the trial or hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This court has long been committed to a liberal view that allows opinion testimony if it will aid the jury and is based on special training, experience, and knowledge with respect to the issue in question. *Cook v. State*, 476 N.W.2d 617, 620 (Iowa 1991); *Mermigis v. Servicemaster Indus., Inc.*, 437 N.W.2d 242, 247 (Iowa 1989).

The qualifications of Mr. Reavis appear to have been adequate to allow him to testify to the matters that were the subject of National States' objections. The topic for expert opinion involved allegedly fraudulent underwriting techniques by insurance companies. Plaintiff's expert was shown to be an authority on that subject through education, background, and experience. We are unable to accept National States' suggestion that only an actuary would be qualified to give a valid opinion on the company's underwriting practices.

Probably the most damaging argument that National States makes in challenging Mr. Reavis's testimony is that the benefit structure of those insurance companies used in his premium comparisons were somewhat more generous than the benefits under National States' policies. We con-

clude, however, that this disparity only affects the weight of the testimony and not its admissibility.

In objecting to the questions propounded to Mr. Reavis, National States did not assert that the factors upon which his opinions were based were not of a type reasonably relied upon by experts in the field. Applying the standards of rule 702 and rule 703, we do not believe that the district court abused its broad discretion in admitting this testimony.

### II. Sufficiency of the Evidence on the Bad–Faith Claim.

■ National States urges that the trial court erred in failing to grant its motion for a directed verdict on the bad-faith claim. In support of this contention, it argues that the legal efficacy of its attempted rescission of plaintiff's policy was "fairly debatable" and thus not actionable under the standard this court adopted in *Dolan v. AID Insurance Co.*, 431 N.W.2d 790, 794 (Iowa 1988).

The reason articulated by National States for denying plaintiff's claim and for its attempted rescission of her policy was the failure on her part to disclose two preexisting health conditions on the insurance application. The basis for this contention was a diagnosis contained on a hospital record of November 10, 1987, which was furnished to National States as part of plaintiff's claim. That diagnosis indicated "confusion" and "hypothyroidism." A reading of the physician's discharge summary for that hospitalization (a document also furnished to National States as part of plaintiff's claim) would have revealed that these conditions were suspected diagnoses at the time of plaintiff's admission, but were not confirmed during her stay in the hospital.

Clearly, National States had no basis for contending that plaintiff had intentionally misrepresented vital health information on her insurance application. However, in considering the merit of National States' motion for directed verdict, we will assume that any material misrepresentation of preexisting health conditions on the appli-cation would have justified rescission even if made unintentionally.

The "fairly debatable" test approved in *Dolan* required plaintiff to establish to the satisfaction of a reasonable fact finder that National States' decision to rescind her policy was not based on an honest and informed judgment. National States based its decision on a single reference found among several pages of hospital records. Any question concerning the validity of the references to "confusion" and "hypothyroidism" contained in the November 10, 1987 hospital record could have been cleared up by a reading of the company's own claim file. National States ignored crucial information in that file and shunned any information that plaintiff's representatives sought to provide on this question. Under the circumstances, the question of bad faith was for the jury to decide.

### III. The Fraud Claim.

■ National States also questions the sufficiency of the evidence on plaintiff's fraud claim. As we have indicated, the district court ordered a remittitur of all damages separately assessed under that theory. Unless we sustain plaintiff's cross-appeal challenging that action or act to reinstate that portion of the verdict under Iowa Rule of Civil Procedure 250, there is no need to decide the issues on appeal relating to the fraud claim. Consequently, we deem it expedient to consider plaintiff's cross-appeal at this juncture.

The jury assessed $40,000 in actual damages on the bad-faith tort claim and another $40,000 on the fraud claim. The trial court believed the fraud verdict to be a complete duplication of the damages awarded for bad faith. In her argument on cross-appeal, plaintiff concedes that $13,000 of the fraud verdict duplicated the damages recovered under the bad-faith tort claim. She urges, however, that $27,000 of the fraud award could have been based on elements of damage not included in the bad-faith award.

Plaintiff's argument is based on the premise that under the evidence the entire $40,000 awarded on the bad-faith claim

could have been for emotional distress. She asserts that, because the record would also support economic damages of $27,000, the jury could legitimately have included that amount in the verdict on the fraud claim.

Plaintiff is correct in contending that, under the trial court's instructions, the jury was permitted to award certain economic damages under the bad-faith claim and the fraud claim, which were not available under the breach-of-contract claim. The instructions also permitted recovery for emotional distress damages under both the bad-faith claim and the fraud claim. We believe plaintiff's argument ultimately fails, however, because the acts constituting bad faith and the acts constituting fraud would have produced identical consequences. There was thus no logical way under the instructions that the jury could have found emotional injury resulted from the bad faith but not from the fraud, or, that economic losses resulted from the fraud but not the bad faith. The district court was correct in concluding that these verdicts completely duplicated each other.[2] Because of the action taken by the trial court, we need not consider National States' challenges to the fraud claim on the merits.

IV. *Sufficiency of Evidence to Support Award of Actual Damages.*

█ National States does not challenge the $43,800 actual damage award on the breach-of-contract claim. It does urge that the evidence is insufficient to support the additional damages awarded for bad faith and for fraud. Because we have confirmed the trial court actions in setting aside the fraud damages, we consider only the bad-faith claim.

On the bad-faith claim, the trial court's instructions allowed the jury to award damages for emotional distress and for econom-

ic loss resulting from premature dissipation of plaintiff's assets. National States concedes that plaintiff's evidence was sufficient to establish *some* economic loss for premature asset dissipation. It urges, however, that the amount of that economic loss was sufficiently small that a reasonable award for emotional damages could not have raised the total damage award to $40,000.

Although the verdict is high, we conclude that it is not without evidentiary support nor is it a product of passion or prejudice. Even if we assume, as National States suggests, that the maximum award for the economic losses permitted under court's instructions was less than $10,000, the jury could have reasonably based the balance of the award on emotional distress.

Plaintiff's closest friend who shepherded her claim through the insurance company and assisted her in obtaining an attorney testified as follows:

Q. When Ida first went in, did you discuss with her the facts that her money was being used, you had to use up her money to pay for the nursing home? A. She understood that when she went in there, yes.

Q. Did you talk about—Did she mention to you that she had this nursing home policy? Did she understand that? A. Oh, yes, she did understand that.

Q. Did you tell her that the insurance company wasn't providing funds to pay for the nursing home care? A. Not when she first went in because I didn't know that.

Q. Okay. Subsequently to that time, did you tell her that? A. Once in a while she would ask me—asked me about her bank account, and how much money she had, and she said, well, we don't have to pay it, the insurance is paying it, so.

2. It is necessary, however, to consider the effect of Iowa Rule of Civil Procedure 250 on the remittitur of the fraud damages. That rule provides that, when a conditional new trial has been avoided by one party's acceptance of the condition and the other party appeals, the original judgment is reinstated. Although the district court chose to handle the problem involving duplication of damages by an order for remittitur, we do not believe this is truly a rule 250 situation. That is because in the present case the fraud damages totally duplicated the damages awarded on the bad-faith claim and thus National States was entitled to have that verdict set aside without regard to any conditional grant of a new trial. As a result, we decline to apply rule 250 in the present case.

Q. And when you discuss the fact that the insurance company wasn't paying it, was she upset about that? A. Yes, she really was.

Q. Would you just describe that to the jury, please. A. Well, she was concerned because she was spending her own money.

Q. Did she realize she didn't have a lot of money to. A. Yes she did.

Q. —to pay for the nursing home care? So she knew she wasn't getting the benefits? A. Yes, she knew that.

. . . .

Q. And one of the issues that the jury may be confronted with is what type of understanding she had of this and what I want to know is, how long would she have been upset or recognize the fact that she wasn't receiving the funds from the insurance company? A. Well, at times, even now, she will say when I have to, you know, take her to see the doctor, take her some place for her eyes, she will say, well, who's paying for this? Do I have to pay for this? How much money do we have? Is the insurance paying it? She will ask me these things just for a period of time.

Q. And can you tell us how long she would have comprehended the fact that the company was not paying the premium—of not paying the $60.00 per day on the nursing home insurance? A. I think she understood that pretty much up to the time [in November 1988] when she was ill with the cancer.

It is, of course, difficult to arrive at a sum of money that fairly compensates for the trauma visited upon elderly persons by having their worldly possessions dissipated by extended care costs that they believe should be covered by insurance. We are convinced, however, that this is a situation capable of producing severe mental suffering. We conclude that the evidence was sufficient to support the damages awarded.

## V. *The Punitive Damage Award.*

Finally, we consider National States' challenge to the jury's award of punitive damages. It asserts that the district court's instructions on punitive damages were inadequate and that the amount of the award was excessive.

■ National States' objection to the jury instructions involved the refusal of the trial court to give its requested instructions, which would have contrasted malicious acts with acts that are merely negligent. Plaintiff's claims of bad faith and fraud were based on the theory that the company was engaging in a general scheme to induce elderly persons to purchase insurance that was not intended by the company to provide the benefits expected. We do not believe that the jury was likely to confuse malicious conduct, as described in the instructions that were given by the trial court, with mere negligence. Moreover, we are persuaded that, once the jury found that a bad-faith tort had been committed under the instructions that were given concerning that cause of action, the elements required for an award of punitive damages had been confirmed. We find no error in the refusal to give the requested instruction.

■ With respect to National States' challenge to the amount of the punitive damage award, this court has reviewed the criteria for reviewing such awards in *Johnston v. Norfolk Southern Corp.,* 448 N.W.2d 486 (Iowa 1989), and *Ryan v. Arneson,* 422 N.W.2d 491 (Iowa 1988). We concluded in those decisions that an inflexible mathematical ratio that focuses on the plaintiff's injuries rather than the wrongful acts of the defendant fails to accomplish the policy objectives of punishment and deterrence. *Ryan,* 422 N.W.2d at 496. Punitive damages exist to punish the particular defendant and to deter the offending party and like-minded individuals from committing similar acts. *Id.; Pringle Tax Serv., Inc. v. Knoblauch,* 282 N.W.2d 151, 154 (Iowa 1979).

In the present case, the jury could have found that the defendant insurance company had been engaging in a calculated scheme to sell insurance to elderly people by means of underwriting practices that would ultimately render the company un-

able to pay the promised benefits. Although National States urges that the jury award of punitive damages represented forty-five percent of the company's net income for a single year, that suggestion is posited upon the company's unaudited determination of net operating income. The company also enjoyed several million dollars in investment income during the time this scheme was in effect. During this time, more than $5,000,000 in dividend income was being paid to company principals. The jury could have determined that a substantial award of punitive damages was necessary to deter the offending conduct. We will not alter the jury's award.

VI. *Interest on the Award of Punitive Damages.*

As a final matter, we consider plaintiff's additional argument on cross-appeal that interest on the punitive damage award should run from the date upon which her petition was filed. To adopt that position would require us to overrule our decision in *Midwest Management Corp. v. Stephens,* 353 N.W.2d 76, 82 (Iowa 1984). Several sessions of the legislature have convened since our decision in *Midwest Management* interpreting the effect of Iowa Code section 535.3 on punitive damage awards. No action has been taken by the legislature to establish a different rule for paying interest on punitive damage awards. Consequently, we decline to overrule *Midwest Management* on this question.

We have considered all issues presented and find no basis for disturbing the judgment of the district court. That judgment is affirmed.

AFFIRMED.