**Timothy BUHMEYER, Plaintiff,**

v.

**CASE NEW HOLLAND, INC. and Gallagher Basset Services, Inc., Defendants.**

**No. 3:04–cv–90095.**

United States District Court, S.D. Iowa, Davenport Division.

Aug. 29, 2006.

Christopher D. Spaulding, Berg, Rouse, Spaulding & Schmidt, PLC, Donald G. Beattie, Beattie Law Firm PC, Des Moines, IA, for Plaintiff.

Craig A. Levien, Martha L. Shaff, Betty Neuman & McMahon, Davenport, IA, for Defendants.

## ORDER ON DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

PRATT, Chief Judge.

### I. INTRODUCTION

Before the Court is Defendants' Motion for Judgment as a Matter of Law (Clerk's No. 85; *see also* Clerk's No. 82), filed July 13, 2006. As an alternative to judgment as a matter of law, Defendants seek amendment of the judgment or a new trial. Plaintiff, Timothy Buhmeyer ("Buhmeyer"), resisted the motion on July 20, 2006 (Clerk's No. 86). Defendants filed a Reply brief on July 26, 2006 (Clerk's No. 87). The matter is fully submitted. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.

### II. BACKGROUND & PROCEEDINGS

The following facts are from a Stipulation between the parties that Buhmeyer's attorney read into evidence at trial. *See* Tr. 106–08. Timothy Buhmeyer was employed by Defendant Case New Holland, Inc. ("Case New Holland") from March 1972 until October 2001. Tr. 106. Defendant Gallagher Basset Services, Inc., ("Gallagher Basset") is the administrator of workers' compensation claims for Case New Holland. *Id.* On May 16, 1994, Buhmeyer underwent a right carpal tunnel release surgery. *Id.* He was given a full duty release to return to work effective June 27, 1994. *Id.* On July 16, 1996, Buhmeyer underwent another carpal tunnel release surgery. *Id.* He was given a full duty release to return to work effective September 3, 1996. *Id.* at 107. Buhmeyer received benefits for these surgeries under an accident and sickness policy. *Id.* On or

around July 11, 2000, Buhmeyer suffered a workplace injury. Buhmeyer saw a doctor named Dr. Jameson, who found "a positive Tinel's sign over the cubital tunnel on the right and left arm[s], bilateral ulnar neuritis, medial epicondylitis, and right carpal tunnel syndrome." *Id.* On February 20, 2001, Dr. Jameson issued a report finding that Buhmeyer had reached maximum medical improvement. *Id.* On July 16, 2001, Buhmeyer visited another doctor, Dr. Hines, who found a permanent functional impairment of thirty-six percent of the body as a whole. *Id.* Even after Dr. Hines' opinion, Defendants refused to pay permanent partial disability payments. Defendants knew that Buhmeyer had not been compensated through workers' compensation for his carpal tunnel syndrome. *Id.* at 107–08. A Deputy Commissioner at the Iowa Workers' Compensation commission eventually awarded Buhmeyer 200 weeks of permanent partial disability benefits at the rate of $538.34 per week, plus interest, from October 20, 2000. *Id.* at 108.

Based on the facts set forth above, Buhmeyer filed an Amended Complaint (Clerk's No. 14) in this Court on March 7, 2005, alleging that Defendants acted in bad faith by wrongfully denying him permanent partial disability benefits in violation of Iowa law. Am. Compl. ¶ 11. Defendants moved for summary judgment on May 15, 2006 (*see* Clerk's No. 33). The Court denied Defendants' Motion for Summary Judgment because it was untimely. *See* Order Denying Defs.' Mot. for Summ. J. (Clerk's No. 34). In doing so, the Court observed that the magistrate judge had already denied Defendants' late-filed motion for an extension of the deadline for dispositive motions. The Court held a jury trial from June 27, 2006 through June 29, 2006 (*see* Clerk's Nos. 67, 69, 73, 78, and 80). The jury returned a verdict for

Buhmeyer, finding that the Defendants acted in bad faith in their handling of Buhmeyer's workers' compensation claim, and finding that Defendants' actions were a proximate cause of injuries to Buhmeyer. The jury awarded Buhmeyer $0 for past, present and future emotional distress, and $10,000 for monetary losses and expenses. *See* Clerk's No. 74. The jury also awarded Buhmeyer punitive damages in the amount of $275,000. *See* Clerk's No. 76. Defendants moved for judgment as a matter of law before the case was submitted to the jury, and the Court denied the motion. Tr. 330. Defendants filed the current motion pursuant to Federal Rule of Civil Procedure Rule 50(b).

### III. STANDARD FOR A RULE 50(b) MOTION

Federal Rule of Civil Procedure 50(b) allows a party to renew a motion for judgment as a matter of law after trial. Rule 50(b) states:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:
>
> (1) if a verdict was returned:
>
> (A) allow the judgment to stand,
>
> (B) order a new trial, or
>
> (C) direct entry of judgment as a matter of law.

Fed R. Civ. P. 50(b). "Judgment as a matter of law is appropriate when 'there is no legally sufficient evidentiary basis for a reasonable jury to find for [the prevailing] party.'" *Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 892 (8th Cir.2005) (quoting Fed R. Civ. P. 50(a)(1)). The Court will grant a motion for judgment as a matter of law "when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." *Ehrhardt v. Penn Mut. Life Ins. Co.*, 21 F.3d 266, 269 (8th Cir.1994). Judgment as a matter of law should be granted "when the record contains no proof beyond speculation to support a verdict." *Wash Solutions*, 395 F.3d at 892. In considering the motion, the Court views the record in the light most favorable to the prevailing party. *Id.* The Court must also assume that all conflicts in the evidence were resolved in favor of the prevailing party, and the Court must assume as proved all facts that the prevailing party's evidence tended to prove. *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir.2003). The Eighth Circuit has observed that "judges must be extremely guarded in granting judgments as a matter of law after a jury verdict." *Id.* Despite this strict standard, "[a] mere scintilla of evidence is inadequate to support a verdict." *Meyers v. Starke*, 420 F.3d 738, 744 (8th Cir.2005).

### IV. LAW AND ANALYSIS

#### A. *Claim for Bad Faith Under Iowa Law*

 Under Iowa law, an employee may sue an employer or the employer's workers' compensation carrier for a "bad faith" delay in the payment of benefits. *McIlravy v. N. River Ins. Co.*, 653 N.W.2d 323, 329 (Iowa 2002). A claim for first-party bad faith arises from "'the knowing failure to exercise an honest and informed judgment' on the part of a defendant from whom the employee seeks compensation due to work-related injuries." *Id.* (quoting

*Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 12 (Iowa 1990)). In order to prevail in a claim for bad faith, the insured party must prove by substantial evidence: "(1) that the insurer had no reasonable basis for denying benefits under the policy and, (2) the insurer knew, or had reason to know, that its denial was without basis." *Id.* (quoting *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 657 (Iowa 2002)); *see also Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 346 (Iowa 1999). The first element is objective, and the second element is subjective. *See Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005).

■ In considering bad faith tort cases against insurers, the Iowa Supreme Court has held that "[a] reasonable basis to deny a claim exists when the claim is fairly debatable." *See Wetherbee v. Economy Fire & Cas. Co.*, 508 N.W.2d 657, 662 (Iowa 1993). Whether a claim is fairly debatable is generally a question of law. *Id.; see also Bellville*, 702 N.W.2d at 473. "The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim. The focus is on the existence of a debatable issue, not on which party was correct." *Bellville*, 702 N.W.2d at 473.

■■ In examining whether a defendant knew or should have known that there was no reasonable basis for denying a plaintiff's claim, the Court must focus "on the defendant's initial denial as well as 'whether, at some later date, [the insurer] became aware there was no reasonable basis to continue denying [the plaintiff's] claim.'" *McIlravy*, 653 N.W.2d at 331 (quoting *Dirks v. Farm Bureau Mut. Ins. Co.*, 465 N.W.2d 857, 862 (Iowa 1991)); *see also Bellville*, 702 N.W.2d at 474 (explaining that "[a]n insurer's negligent or subpar investigation or evaluation of a claim is

relevant to the fact finder's determination of whether the insurer should have known its denial lacked a reasonable basis"). Bad faith may be inferred from a flawed or inadequate investigation by the insurer. *See McIlravy*, 653 N.W.2d at 333. As such, "[i]t is appropriate, in applying the test, to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review." *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988) (citation omitted).

### B. *Whether Defendants Admitted Liability at Trial*

■ Buhmeyer contends that Defendants cannot now deny liability because their attorney, Craig Levien, admitted liability at trial. Specifically, Buhmeyer refers to Levien's closing argument during the punitive damages phase of the trial. Citing the Iowa Supreme Court's decision in *State v. Howell*, 290 N.W.2d 355, 359 (Iowa 1980), Buhmeyer contends that admissions of an attorney are admissible against the attorney's client. While this may be true as a general matter, the Court cannot conclude that any statement that Levien made during closing arguments in the punitive damages phase was an admission. The only statement that Levien made during his closing argument that could even remotely be construed as an admission was the following: "[W]e received your verdict, we accept your verdict, and we appreciate the service that you've provided over the last three days. We acknowledge, without question, that mistakes were made, and you told us that in your verdict." Tr. 393. This statement does not constitute an admission of liability. In *Howell*, the court cautioned that "[a]dmissions of an attorney, in order to bind his client, must be distinct and formal, and made for the express purpose of

dispensing with formal proof of a fact at the trial." *Howell,* 290 N.W.2d at 359. The rule is similar under federal law. *See, e.g., Wieder v. Towmotor Corp.,* 568 F.Supp. 1058, 1063 (E.D.Pa.1983) ("Generally, admissions of fact made by counsel are binding upon their principals so long as they are 'unequivocal.' "). Defendants point to an early Iowa Supreme Court decision in which the court considered whether a statement made by an attorney during argument to the jury was an admission. *See Chown v. Lennox Furnace Co.,* 166 Iowa 1, 147 N.W. 144, 147 (Iowa 1914). The court concluded that it was not, explaining: "Formal admissions of counsel, during the trial of a case, and so intended, are binding. Made in the heat of argument they may not represent the position of the party so fully or correctly as when deliberately uttered." *Id.* Here, any statement that Levien made during argument in the punitive damages phase reflected an effort to minimize the amount of punitive damages awarded in light of the fact that the jury had already returned a verdict on liability. It is clear that nothing he said was intended as an admission.

### C. *Sufficiency of the Evidence as to Liability*

Defendants contend that the jury's verdict on the question of liability was not supported by the evidence. At trial, Buhmeyer presented testimony from two claims adjustors who handled Buhmeyer's claim for Gallagher Basset. The first claims adjustor, Pam Diveney, was not available to testify at trial, but Buhmeyer's attorneys read portions of her deposition into evidence. *See* Tr. 266. The second claims representative, Catherine Sams, testified at trial. Tr. 47. The jury heard evidence that Diveney received an interim report, dated October 19, 2000, from Buhmeyer's treating physician, Dr. Jameson. Diveney testified in her deposition that she

knew that Buhmeyer suffered from chronic carpal tunnel syndrome, and Dr. Jameson's report indicated that Buhmeyer had chronic carpal tunnel syndrome. Tr. 269; Diveney Dep. 43; *see also* Defs.' Ex. 5. On February 12, 2001, Diveney wrote to Dr. Jameson asking about Buhmeyer's carpal tunnel injury. Specifically, the letter asked whether Buhmeyer had reached maximum medical improvement for the carpal tunnel injury, and whether there was any permanency. *See* Pl.'s Ex. 2; Tr. 66. Dr. Jameson replied in a letter dated February 20, 2001, stating that Buhmeyer had reached maximum medical improvement and giving him a zero impairment rating:

> Dear Pam:
>
> I did assign permanent restrictions on TIMOTHY L. BUHMEYER with follow-up on prn basis. I feel he has reached maximum medical improvement regarding this injury and he has already been compensated for his chronic carpal tunnel syndrome. He should have no further impairment regarding this injury; therefore his permanent impairment is 0%.
>
> Sincerely,
>
> Theron Q. Jameson, D.O.

Pl.'s Ex. 3. Sams testified that this letter constituted the entire basis for her decision not to pay benefits to Buhmeyer until after the appeal decision at the Workers' Compensation Commission. Tr. 82, 92. On cross examination, Defendants presented an exhibit comprised of notes taken by Diveney. *See* Defs.' Ex. 1; Tr. 86. Sams testified that Diveney's notes indicated that Diveney told Buhmeyer that he could seek a second opinion from another doctor or from Dr. Jameson, but Buhmeyer declined to do so. Tr. 86. Sams also testified that, to her knowledge, Buhmeyer did not seek further medical treatment after

Dr. Jameson's zero percent impairment rating. Tr. 105. As noted above, the parties stipulated to the fact that Defendants knew that Buhmeyer had never received workers' compensation for his carpal tunnel syndrome, despite Dr. Jameson's statement that Buhmeyer had already been compensated. Tr. 107.

Buhmeyer visited another doctor, Dr. Hines, on July 16, 2001. Buhmeyer sought an Independent Medical Evaluation (IME) from Dr. Hines. Dr. Hines found a permanent functional impairment of thirty-six percent of Buhmeyer's body as a whole, including injuries to his shoulder. Tr. 107; Pl.'s Ex. 4. Paul Nitzel, a human resources manager for Case New Holland's Burlington, Iowa, plant, testified that he did not know whether anybody at Case New Holland read Dr. Hines's report. Tr. 125. Sams testified that she did not read Dr. Hines's report. Tr. 78, 98.

The parties' expert witnesses disagreed about whether Case New Holland and Gallagher Basset acted reasonably in declining to pay permanent partial disability benefits to Buhmeyer. Buhmeyer's expert witness, David Barry Moranville, testified that he thought the Defendants should have conducted further investigation into Buhmeyer's claim after the examination by Dr. Hines. Tr. 200–01. Moranville testified that, in his opinion, it was not good claims practice for Diveney to ask Dr. Jameson about the carpal tunnel injury without asking about the other injuries Buhmeyer claimed he had. Tr. 203. On cross examination, however, Moranville testified that earlier exam notes by Dr. Jameson indicated that Buhmeyer's elbows and shoulders were pain-free, leaving no reason for Diveney to inquire about those injuries. Tr. 224–25. Moranville commented that Dr. Jameson's statement that Buhmeyer had received compensation for his injury was not true, and in Moranville's

view, the statement was unusual because it was unrelated to any medical opinion. Tr. 208. On cross examination, Moranville acknowledged that Dr. Hines is generally thought to be "claimant-oriented." Tr. 228.

In contrast, the Defendants' expert, Bill Scherle, testified that he thought the actions taken by the Defendants were reasonable in light of the evidence available to them at the time. Tr. 280–81, 289. Scherle testified that Dr. Hines's report did not change his assessment of the case, although he acknowledged that he did not recall anybody working for either Defendant stating that they read the report. Tr. 307, 309.

■ Having reviewed the trial transcript and the exhibits from the trial, the Court concludes that the evidence presented was sufficient to demonstrate that the Defendants did not have an objectively reasonable basis for denying Buhmeyer's claim. Sams testified that Dr. Jameson's February 20, 2001, letter was the sole reason that she denied Buhmeyer's claim. Tr. 82, 92. Dr. Jameson's letter stated: "I feel he has reached maximum medical improvement regarding this injury and he has already been compensated for his chronic carpal tunnel syndrome." Pl.'s Ex. 3. The parties stipulated the Defendants knew Buhmeyer had not been previously compensated through workers' compensation for his carpal tunnel syndrome. Tr. 107–08. Thus, a significant finding in Dr. Jameson's short letter was "patently wrong." *Cf. Bellville*, 702 N.W.2d at 478 (concluding that the insurer's basis for denying the plaintiffs claim was fairly debatable and observing that the plaintiff did not present any evidence at trial demonstrating that he brought facts to the insurer's attention indicating that their basis for denying the claim was "patently wrong"); *see also Etten v. U.S. Food Serv., Inc.,* 446

F.Supp.2d 968, 976, 2006 WL 2246399, at *7 (N.D.Iowa 2006) (concluding that a jury could find that the defendants did not have an objectively reasonable basis for denying the claim). Because the letter constituting Defendants' entire basis for denying the claim contained a known error, the letter did not constitute an objectively reasonable basis for denying the claim.

■ Buhmeyer also presented sufficient evidence demonstrating that the Defendants knew, or had reason to know, that there was no reasonable basis for denying the claim. As noted above, under Iowa law, bad faith may be inferred from a flawed or inadequate investigation on the part of the insurer. *McIlravy*, 653 N.W.2d at 333. In some respects, this case resembles the case that the Iowa Supreme Court considered in *McIlravy*. In that case, the plaintiff sought workers' compensation for a knee injury that occurred at work. The employer initially denied his claim on the basis that the injury only coincidentally occurred during work hours, relying on the fact that the injury occurred while the plaintiff was simply walking across a room. *Id.* at 326. Later, the plaintiff's doctor sent a letter to the employer in which he expressed his opinion that the injury was work related. *Id.* at 326–27. The employer did not conduct any investigation to dispute or corroborate the doctor's opinion, and continued to deny the claim. The court concluded that, although the employer may have had a reasonable basis to deny the plaintiff's claim initially, the employer was under an ongoing duty to investigate the claim, particularly after it received the doctor's opinion. The court explained: "We recognize an incomplete investigation will not alone support recovery for bad faith if the insurer nevertheless had a reasonable basis for deni-

al. Yet, the failure of [the employer] to investigate ... went to the very foundation of the basis for its denial." *Id.* at 333. The Court went on to state that a jury could reasonably infer from the employer's actions that it knew it had no reasonable basis for denying the claim. *Id.*; *see also Bellville*, 702 N.W.2d at 474 (observing that the thoroughness of the defendant's investigation is relevant to the fact finder's determination about whether the defendant knew or should have known that its denial lacked a reasonable basis).

■ Here, even if Dr. Jameson's letter constituted a reasonable basis to deny Buhmeyer's claim initially, the Defendants were under a duty to continue to investigate the claim. This was particularly true in light of the incorrect statement in Jameson's letter. The apparent need for additional investigation only increased after the exam by Dr. Hines resulted in a different opinion than the exam conducted by Dr. Jameson. It is true that a negligent investigation, standing alone, is not enough to support a bad faith claim. *See Bellville*, 702 N.W.2d at 474. Here, however, it is notable that the jury heard testimony that various employees of the Defendants had access to, but did not read, Dr. Hines's report. The Defendants' apparent nonfeasance was sufficient evidence for the jury to conclude that the Defendants had reason to know that there was no reasonable basis for denying the claim. *See McIlravy*, 653 N.W.2d at 333. Because Buhmeyer provided sufficient evidence to support the jury's finding of liability, the Court sees no reason to "invade the jury's domain" by disturbing the verdict. *See United States v. Samuels*, 808 F.2d 1298, 1301 (Arnold, J., concurring).

### D. *Compensatory Damages*

Defendants contend that the jury's award of $10,000 in compensatory damages

for economic loss should be vacated because there was not sufficient evidence to support any award of actual damages. When Defendants initially moved for judgment as a matter of law at trial under Federal Rule of Civil Procedure 50(a), Defendants argued that economic loss damages are not permissible under Iowa law in a bad faith tort case.[1] Tr. 331. The Court will therefore address the question whether Iowa law permits damages for economic loss in a bad faith case before considering the sufficiency of the evidence.

### 1. *Damages for economic loss under Iowa law.*

 It is well-settled that a plaintiff alleging a bad faith denial of worker's compensation benefits may recover compensatory damages for emotional distress. *See Niver v. Travelers Indem. Co. of Ill.*, 433 F.Supp.2d 968, 986 (N.D.Iowa 2006). In *Niver*, the Northern District of Iowa concluded that Iowa law also permits a plaintiff to recover damages for economic loss in a tort action alleging a bad faith denial of workers' compensation benefits. 433 F.Supp.2d at 986. The *Niver* court cited *Nassen v. Nat'l States Ins. Co.*, 494 N.W.2d 231, 237–38 (Iowa 1992), an Iowa Supreme Court case in which the court sustained an award for economic loss due to dissipation of assets in a bad faith case. *Nassen*, 494 N.W.2d at 237. Although the *Nassen* court did not address the question of economic loss damages in detail, the court concluded that the evidence was sufficient to support the jury's award of actual damages, which included damages for

economic loss due to premature asset dissipation. *See id.* Having reviewed *Nassen* again, the Court reaffirms its earlier conclusion that Iowa law permits recovery for economic loss damages in bad faith cases. *See* Order on Mot. in Limine (Clerk's No. 63).

### 2. *Sufficiency of the evidence on the question of actual damages.*

 Defendants contend that the evidence presented at trial was insufficient to support the jury's award of $10,000 in actual damages, and that the award should be either vacated or reduced. Under Iowa law, the fact finder must deny recovery if the record is uncertain and speculative as to whether a party has sustained damages. *See Field v. Palmer*, 592 N.W.2d 347, 353 (Iowa 1999). However, "if the uncertainty is only in the amount of damages, a fact finder may allow recovery provided there is a reasonable basis in the evidence from which the fact finder can infer or approximate the damages." *Id.; see also Natkin & Co. v. R.F. Ball Constr. Co.*, 255 Iowa 1156, 123 N.W.2d 415, 422 (Iowa 1963). Moreover, an award of damages should be sustained so long as it is evident that some damages occurred, even if the amount is difficult to ascertain. *Palmer v. Albert*, 310 N.W.2d 169, 174 (Iowa 1981).

Here, the jury heard sufficient evidence to conclude that Buhmeyer suffered damages that were proximately caused by the Defendants' actions. When asked about his economic situation after he learned of

---

1. Defendants initially raised this argument in a pre-trial motion in limine (Clerk's No. 41), and again at the close of evidence in their Rule 50(a) motion. Defendants have not raised the argument again in their renewed motion under Rule 50(b), and the argument arguably may be considered waived for that reason. *See Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631, 636 (8th Cir.1998) ("A party is required to have raised the reason for which it is entitled to judgment as a matter of law in its Rule 50(a) motion before the case is submitted to the jury and reassert that reason in its Rule 50(b) motion after trial if the Rule 50(a) motion proves unsuccessful."). The Court will, however, address the argument in anticipation of a likely appeal.

Dr. Jameson's letter and was advised that his claim would be denied, Buhmeyer responded that he became a "straight-time" employee, whereas he had previously received incentive pay:

> Well, at that point in time [Diveney] informed me that I was no longer eligible for the difference in the payments because they had—I had went on the trucking job, and I became a straight-time employee at that point. So at that point in time, I didn't collect any more money until the settlement, you know, and for the rest of the period of time, I was just on a straight time after that, you know.

Tr. 146. Moranville explained that "you can make more money if you work on incentives, and if you can't do that, in other words, if you're disabled from doing it, you're going to make less money. That means your earning capacity is lowered." Tr. 196. Buhmeyer testified that, prior to becoming a straight-time employee, he contributed eighteen to twenty percent of his income to a 401(k) plan offered by the company. Tr. 146. Buhmeyer testified that after he became a straight-time employee, he stopped contributing to his retirement funds: "[W]hen I did go to straight time, I withdrew my contribution to my 401(k) because that was about the difference between the straight time and the piecework money, and that was kind of how I had my investment money budgeted was to go ahead and put that difference in my 401(k)." Tr. 147. Buhmeyer's wife, Elizabeth Buhmeyer, also testified that she recalled that he quit contributing to his retirement account after he went off of piece work.[2] Tr. 259.

At trial, Moranville explained how the "weekly rate" works under Iowa workers' compensation law:

> A weekly rate is a partial wage replacement amount that the worker receives every week. At the time of the injury, the rate is set, and if it is correctly set, it never changes. It doesn't matter what sort of payments are being made, except in temporary partial disability, where there's that split. But if it's for a whole week, it's one rate always, and, as I said before, it's roughly 80 percent of the wages, the net wages of the—that the employee had as of the date of the injury.

Tr. 183. The jury also heard testimony that three and a half years passed before Buhmeyer received any compensation as a result of the Workers' Compensation Commission decision. Tr. 130. The Defendants introduced evidence indicating that Buhmeyer received ten percent interest on the award that he eventually received as a result of the Iowa Workers' Compensation Commission decision. *See* Tr. 216. Even after considering the interest, the jury could have inferred from the evidence that Buhmeyer lost $10,000 as a result of ceasing contributions to his retirement plan for three and a half years. Because the evidence demonstrated that Buhmeyer did not receive his workers' compensation benefits in a timely fashion, as he would have in the absence of bad faith actions by the Defendants, the Court concludes that the evidence was sufficient to support the jury's award of actual damages.

### E. *Punitive Damages*

After the jury returned its verdict on compensatory damages, the Court conducted a second phase of the trial and

---

2. On cross examination, Mrs. Buhmeyer testified that after Buhmeyer received the workers' compensation award, he did not put any of that money into a retirement plan. Tr. 436.

submitted the question of punitive damages to the jury. The jury awarded Buhmeyer punitive damages in the amount of $275,000. *See* Clerk's No. 76. The Defendants contend that the evidence was insufficient to support an award of punitive damages, and that the punitive damages award should be reduced to $0 pursuant to Federal Rule of Civil Procedure 59(e). In the alternative, the Defendants contend that the jury's punitive damages award is grossly excessive in violation of the Federal Constitution.

1. *Sufficiency of the evidence.*

 Under Iowa law, punitive damages may be imposed to punish the defendant's willful and wanton conduct and to deter the defendant, or others, from repeating such conduct in the future. *See Hamilton v. Mercantile Bank of Cedar Rapids*, 621 N.W.2d 401, 407 (Iowa 2001). In order to obtain punitive damages, the plaintiff must prove, by a preponderance of clear, convincing, and satisfactory evidence, that "the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." *Id.; see also* Iowa Code § 668A. 1(1)(a). The Iowa Supreme Court has defined "willful and wanton" as meaning that: "the actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 395 (Iowa 2001) (citations omitted). Moreover, a plaintiff seeking to establish that conduct was willful and wanton must demonstrate that the defendant's conduct constituted actual or legal malice. *Id.* at 396. "Actual malice is characterized by such factors as personal spite, hatred, or ill will," while "[l]egal malice is shown by

wrongful conduct committed or continued with a willful or reckless disregard for another's rights." *Id.* (citations omitted). Under these standards, a plaintiff seeking punitive damages must demonstrate something more than negligence on the part of the defendant. *Id.*

 Here, Buhmeyer did not present any evidence that the Defendants' conduct was motivated by personal spite, hatred, or ill will. Therefore, the Court must consider whether Buhmeyer presented evidence to support a finding of legal malice. *See Gibson*, 621 N.W.2d at 397. As discussed above, the evidence at trial supported the jury's finding that the Defendants had no reasonable basis for denying Buhmeyer's claim, and that the Defendants knew or had reason to know that they had no reasonable basis for denying the claim. The jury could reasonably infer, based on the evidence presented, that Defendants acted with willful or reckless disregard for Buhmeyer's rights, and that it was likely that harm would result. *See id.* (overturning court's directed verdict for defendant on question of punitive damages in bad faith case); *see also Rowe v. Hussmann Corp.*, 381 F.3d 775, 784 (8th Cir.2004) (upholding high compensatory and punitive damages awards because the jury heard sufficient evidence to justify the awards); *Nassen*, 494 N.W.2d at 238 (noting that "once the jury found that a bad-faith tort had been committed under the instructions that were given concerning that cause of action, the elements required for an award of punitive damages had been confirmed"). The Court concludes that the evidence was sufficient to support an award of punitive damages.

2. *Constitutionality of punitive damages award.*

 Defendants next argue that the punitive damages award of $275,000 was

excessive in violation of the Federal Constitution. The United States Supreme Court has held that there are constitutional limits on the amount of punitive damages that a court can impose, observing that "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."[3] *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). This is because the Due Process Clause requires that a person receive fair notice of both the type of conduct that will result in punishment and the severity of the penalty that may be imposed. *Id.* In imposing restrictions on the amount of punitive damages that may be awarded, the Court has recognized that punitive damages generally serve the same aims as criminal punishment, without the same constitutional protections afforded defendants in criminal proceedings. *Id.* at 417, 123 S.Ct. 1513.

■■■ The United States Supreme Court has established the following guideposts for courts to consider when determining whether a jury's award of punitive damages is excessive: (1) the degree of reprehensibility of the defendant's actions; (2) the disparity between the harm or potential harm suffered by the plaintiff and the amount of punitive damages awarded; and (3) the difference between the punitive damages award and the civil penalties authorized or awarded in similar cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 435, 121 S.Ct. 1678, 149 L.Ed.2d 674

(2001); *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 602 (8th Cir. 2005). The Court will examine each of these guideposts below.

a. *Reprehensibility of conduct.*

In considering the reprehensibility of a defendant's conduct, the United States Supreme Court has instructed courts to consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419, 123 S.Ct. 1513. The Court has indicated that the presence of one of these factors alone may not be sufficient to sustain a punitive damages award, and "the absence of all of them renders any award suspect." *Id.*

On examination of the evidence presented, it is evident that at least two of these factors weigh in Buhmeyer's favor. As discussed above, the jury's finding of bad faith is enough to infer that the Defendants' conduct evinced an indifference to, or reckless disregard for, Buhmeyer's health and welfare. The Defendants had reason to know that there was no reasonable basis for denying Buhmeyer's claim without further investigation once Dr. Hines conducted his examination. Moreover, the Defendants had reason to know

---

**3.** The Iowa Supreme Court also has a long history of limiting the amount of punitive damages awarded. *See, e.g., Saunders v. Mullen*, 66 Iowa 728, 24 N.W. 529, 530 (Iowa 1885) (deeming punitive damages award "excessive" where plaintiff sustained $50 in actu-

al damages but received $650 in punitive damages). The Iowa Supreme Court's opinions track the United States Supreme Court's holdings in this area. *See Eden Elec., Ltd. v. Amana Co.*, 370 F.3d 824, 827 (8th Cir.2004).

that Buhmeyer was financially vulnerable, given that he was unable to do incentive work due to his injury. Accordingly, the conduct was reprehensible enough to warrant some amount of punitive damages. However, Buhmeyer did not present any evidence indicating that the Defendants' conduct was not isolated. Moreover, the damage that Buhmeyer sustained was purely economic, and Buhmeyer did not present any evidence that would produce an inference of intentional malice, trickery, or deceit. These factors, then, tend to show that the Defendants' conduct, while reprehensible, was not so egregious as to warrant an extremely high punitive damages award. *See id.* at 424, 123 S.Ct. 1513 (concluding that an insurer's conduct in declining to settle a claim, while reprehensible, did not warrant the high punitive damages awarded in a bad faith case).

b. *Disparity between actual harm and punitive damages.*

The second *Gore* guidepost concerns the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. In examining this prong, the Supreme Court has been reluctant to impose a precise mathematical formula on the amount of punitive damages that may be awarded. The Court has observed, however, that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425, 123 S.Ct. 1513. In *Pacific Mutual Life Insurance Company v. Haslip*, the Supreme Court indicated that a punitive damages award that was more than four times the amount of compensatory damages was "close to the line" of constitutional impropriety. 499 U.S. 1, 23, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The Court cited the four to one ratio again in *Gore,* noting that modern-day federal statutes sometimes allow for double or treble dam-

ages. *Gore,* 517 U.S. at 581 & n. 33, 116 S.Ct. 1589; *see also Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.,* 418 F.3d 820, 840 (8th Cir.2005) (affirming remitted damages award where ratio of reduced award was four to one) (citations omitted); *Stogsdill v. Healthmark Partners, L.L.C.,* 377 F.3d 827, 833 (8th Cir.2004) (approving a four to one ratio as an "appropriate due process maximum" in light of the facts); *Eden,* 370 F.3d at 829 (upholding a remitted damages award with a punitive to compensatory ratio of 4.5 to one in an Iowa tort case where the conduct was "extraordinarily reprehensible"). In other cases, the Court has cited the single-digit ratio as an appropriate guideline for courts to follow. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513. In declining to establish a hard rule for limiting punitive damages, the Court has explained that a particularly egregious act resulting in low compensatory damages might warrant approval of a higher ratio. *Id.; see also Morse v. Southern Union Co.,* 174 F.3d 917, 925–26 (8th Cir.1999) (approving punitive to compensatory damages ratio of six to one where district court also remitted compensatory damages award). Conversely, where compensatory damages are substantial, a lesser ratio may be all that the Constitution allows. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513; *see also Conseco Finance Servicing Corp. v. N. Am. Mortgage Co.,* 381 F.3d 811, 825 (8th Cir.2004) (remitting punitive damages from $18 million to $7 million because the plaintiff received "a large compensatory award" in the amount of $3.5 million); *Williams v. ConAgra Poultry Co.,* 378 F.3d 790, 799 (8th Cir.2004) (remitting punitive damages from $6 million to $600,000 where plaintiff received a substantial compensatory award, also in the amount of $600,000). It is the Court's duty to "ensure that the measure of punishment is both reasonable and proportionate to the

amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426, 123 S.Ct. 1513; *see also Pulla v. Amoco Oil Co.,* 72 F.3d 648, 660–61 (8th Cir.1995). Here, the punitive damages award was more than twenty-seven times the compensatory damages awarded by the jury. Given the fact that the Defendants' conduct falls somewhere in the middle of the reprehensibility analysis, this award is unconstitutionally high. The Court now turns to the third guidepost to determine a reasonable amount of punitive damages.

### c. *Civil penalties authorized or imposed in comparable cases.*

The third guidepost to consider when assessing the constitutionality of punitive damages is the amount of civil penalties authorized or imposed in similar cases. *Campbell,* 538 U.S. at 428, 123 S.Ct. 1513. In this case, Buhmeyer received a penalty award in the amount of $25,000 as a result of the Deputy Workers' Compensation Commissioner's decision, pursuant to Iowa Code § 86.13.[4] Section 86.13 provides that penalty benefits may be awarded in an amount up to fifty percent of the amount of benefits owed: "If a delay in commencement or termination of benefits occurs without reasonable or probable cause or excuse, the workers' compensation commissioner shall award benefits in addition to those benefits payable under this chapter, or chapter 85, 85A, or 85B, up to fifty percent of the amount of benefits that were unreasonably delayed or denied." Iowa Code § 86.13. As discussed above, Buhmeyer ultimately received a compensation award in the amount of 200 weeks of permanent partial disability benefits at the rate of $538.34, plus interest, from October 20, 2000, an award of approximately $107,000 before interest.[5] *See* Tr. 108. Using Iowa Code § 86.13 as a guide, a civil penalty of up to fifty percent of the unpaid benefits may be imposed for a wrongful delay of workers' compensation benefits. Thus, the statute would have permitted a civil penalty in this case in the amount of 100 weeks of pay (just under $54,000 without interest), although the Deputy Commissioner chose a penalty award of fifty weeks instead.

Having considered the *Gore* guideposts, the Court concludes that the punitive damages award shall be remitted to $40,000. This figure reflects the following considerations: (1) the Defendants' conduct met some, but not all, of the reprehensibility factors; (2) at four to one, the ratio of punitive damages to compensatory damages is within the bounds of what the Supreme Court has recognized as constitutionally permissible; and (3) Iowa law authorizes a civil penalty of up to half the amount of benefits that were wrongfully withheld. While the Court recognizes that the amount of any remitted punitive damages award will naturally be somewhat arbitrary, the Court concludes that a $40,000 award will further the state's goals of punishment and deterrence without violating constitutional limits. *See generally Diesel Machinery,* 418 F.3d at 840 (approving award where two reprehensibility factors were present and observing that the award would "further the state's twin goals of punishment and deterrence") (citations omitted).

### F. *Offset for Penalty Benefits Already Paid*

 The Defendants contend that the amount of punitive damages should be re-

---

4. Evidence of this penalty award was excluded at trial.

5. During opening statement, Buhmeyer's attorney told the jury that Buhmeyer received approximately $120,000, including ten percent interest. Tr. 40.

duced by $25,000 to offset the penalty award that the Defendants have already paid pursuant to the Iowa Workers' Compensation Commission decision. Defendants cite *In re Trans Union Corp. Privacy Litigation*, 211 F.R.D. 328, 341–42 (N.D.Ill.2002), to support their contention that "a double penalty for the same act violates due process." In *Privacy Litigation*, the court considered whether the damages provisions in the Fair Credit Reporting Act, 15 U.S.C. § 1681n(a)(1)(A), impermissibly allowed for a double recovery in the form of actual damages plus statutory damages plus punitive damages. The court concluded that the plain language of the statute provided for compensatory damages in the form of either actual damages or statutory damages, plus punitive damages, and thus did not permit a "double recovery." *Privacy Litigation*, 211 F.R.D. at 342. The court did not discuss what sort of statutory scheme might constitute a "double recovery" in violation of due process.

Defendants also cite *Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 668 (Mo.Ct.App.1997), in which the court considered whether the defendant could receive a statutory credit for punitive damages paid in another case involving a different plaintiff but arising from the same incident. The case required the court to interpret a Missouri statute that mandates a credit for punitive damages owed by a defendant where the defendant previously paid punitive damages arising out of the same conduct. *See* Mo.Rev.Stat. § 510.263.4. The Defendants have not pointed to a similar statute here. *See Barnett*, 963 S.W.2d at 668 n. 17 (observing that Missouri's statutory credit mechanism appears to be unique).

Neither *Privacy Litigation* nor *Barnett* is directly on point in this case. When the Iowa Supreme Court initially recognized a first-party bad faith tort under Iowa law, the court observed that "traditional damages for breach of contract will not always adequately compensate an insured for an insurer's bad faith conduct." *Dolan*, 431 N.W.2d at 794. The court continued: "Our focus, of course, is on the recompense available to the affected insured, not the extent to which the insurer may be subject to additional statutory penalties for its misconduct." *Id.* And, when the court extended the availability of the first-party bad faith tort to workers' compensation claims, it explicitly recognized that the penalty provision in Iowa Code § 86.13 should not be the sole remedy for wrongful conduct in workers' compensation claims:

> We conclude that it is unlikely that the legislature intended the penalty provision in section 86.13 to be the sole remedy for all types of wrongful conduct by carriers with respect to administration of workers' compensation benefits. By its terms, it applies only to delay in commencement or termination of benefits. It contemplates negligent conduct rather than the willful or reckless acts that are required to establish a cause of action under *Dolan*.

*Boylan v. Am. Motorists Ins. Co.*, 489 N.W.2d 742, 744 (Iowa 1992). Thus, the court recognized "two distinct methods by which a self-insured employer or an employer's workers' compensation carrier may be penalized due to their delay in payment of workers' compensation benefits." *McIlravy*, 653 N.W.2d at 328. In *McIlravy*, the court elaborated on the rationale for allowing bad faith claims in workers' compensation cases: "Bad faith claims are applicable to workers' compensation insurers because they hold the discretionary power to affect the statutory rights of workers, which clearly reflects their obligation to act in good faith in the exercise of this authority." *Id.* at 329.

The Iowa Supreme Court's careful reasoning in a succession of cases indicates that any penalty awarded by the Workers' Compensation Commission is separate, and in addition to, punitive damages awarded in a bad faith tort action. Indeed, the bad faith tort action exists to provide an additional remedy for plaintiffs where the insurer acted in bad faith. Because the punitive damages awarded in Buhmeyer's bad faith action serve a purpose distinct from the penalty award in the administrative action, the Defendants' request for a credit is denied.

### G. Request for a New Trial

As an alternative to judgment as a matter of law, the Defendants request that the Court grant a new trial pursuant to Federal Rule of Civil Procedure 59 on the basis that substantial justice has not been achieved between the parties and the verdict is against the weight of the evidence. "When considering whether to grant or deny a motion for new trial, a district court must consider whether the verdict is against the weight of the evidence and if allowing it to stand would result in a miscarriage of justice." *Adzick v. UNUM Life Ins. Co. of Am.*, 351 F.3d 883, 886 (8th Cir.2003). "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.'" *White v. Pence*, 961 F.2d 776, 780 (8th Cir.1992) (quoting *Ryan v. McDonough Power Equip.*, 734 F.2d 385, 387 (8th Cir.1984)). As a general matter, the decision whether to grant a new trial is left to the sound discretion of the trial court. *Watson v. O'Neill*, 365 F.3d 609, 614 (8th Cir.2004). A trial court's discretion is not boundless, however, and "the district court is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *White*, 961 F.2d at 780. Finally, the Court should be reluctant to grant a new trial where the subject matter of the litigation is simple and there is little chance that the legal principles presented would confuse the jury. *Id.* at 781.

As discussed above, the evidence in this case was sufficient to support the jury's verdict against Case New Holland and Gallagher Basset. Because the evidence was sufficient to support the verdict, the Court concludes that substantial justice has been done. *See Larson v. Farmers Co-op. Elevator of Buffalo Ctr.*, 211 F.3d 1089, 1095 (8th Cir.2000) (observing that a miscarriage of justice occurs when there is insufficient evidence to support the verdict). The Defendants' request for a new trial is denied.

## V. CONCLUSION

For the reasons discussed above, the Defendants' Motion for Judgment as a Matter of Law is DENIED. Defendants' Motion for a New Trial is also DENIED. Defendants' Motion to Alter or Amend Judgment (Clerk's No. 85–1) is granted in part and denied in part. The Clerk is ordered to AMEND the judgment to remit the amount of punitive damages from $275,000 to $40,000.

IT IS SO ORDERED.